# BURSOR & FISHER
### P.A.

888 SEVENTH AVENUE
NEW YORK, NY 10019
www.bursor.com

JOSEPH I. MARCHESE
Tel: 646.837.7410
Fax: 212.989.9163
jmarchese@bursor.com

December 12, 2016

**_By ECF & Email:_**

The Honorable Analisa Torres
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT-JLC (S.D.N.Y.)

Dear Judge Torres:

      I write on behalf of Plaintiff Josephine James Edwards ("Plaintiff") pursuant to Rule III.A(ii) of Your Honor's Individual Practices in Civil Cases in response to Defendant Hearst Communications, Inc.'s ("Hearst's") December 5, 2016 letter, Doc. No. 91, requesting a conference concerning its anticipated motion to dismiss for lack of standing pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3), and requesting that Your Honor set a schedule for the parties' compliance with Rule III(C)(ii) of Your Honor's Individual Practices. Plaintiff will oppose both motions. Plaintiff also requests that Your Honor grant her permission to make her own motion for summary judgment with respect to her claims.

## Plaintiff's Allegations Have Been Demonstrated By Uncontroverted Evidence

      As Your Honor noted in denying Hearst's motion to dismiss, Plaintiff's Consolidated Class Action Complaint "allege[d] that Defendant disclosed protected information about Plaintiff[] in two ways: by selling it to third parties, and by providing it to 'data' mining companies who then supplemented it with additional data to enhance the value of the information for Defendant." *Boelter v. Hearst Commc'ns, Inc.*, 2016 WL 3369541, at *3 (S.D.N.Y. June 17, 2016).[1] The evidence Plaintiff has discovered to date supports those allegations. Plaintiff has discovered that her Personal Reading Information ("PRI") was disclosed to at least six third party data companies, for up to 83 total disclosures in violation of the VRPA. We have documentary and testimonial evidence further confirming at least 11 of these disclosures, to five different entities from 2011 to 2015.[2] Plaintiff has also discovered evidence that one of these third party entities, ███████████████████████████████████████████████████████████,

---

[1] Despite this, Hearst's letter focuses disproportionately on Plaintiff's purported "theory at the heart of" the case that Hearst rents its customer lists "to direct mail marketers, including non-profit organizations, and political organizations," Hearts Ltr. at 1, and gives perfunctory treatment to the theories that Your Honor noted in her order denying Hearst's motion to dismiss.

[2] ██████████████████████████████████████████████████████████████████████ *See* Hearst's Fourth Amended Objections and Responses To Plaintiff's First Set Of Interrogatories, Ex. C, at Response No. 4.



party entities, ██████████████████████████████████████████
███████████████.  And Plaintiff has discovered evidence that Acxiom and Experian
supplemented Hearst's subscribers' PRI, including Plaintiff's PRI, with additional data to
enhance the value of that information for Hearst.

Plaintiff also alleged that Hearst "never provided any written notice that Hearst sells its
customers' Personal Reading Information, or any means of opting out."  Consol. Compl. 15-cv-
03934-AT-JLF, Doc. No. 67 ¶ 8.  The evidence Plaintiff has discovered to date also substantiates
those allegations.  Hearst's 30(b)(6) designee, Mr. James Murphy, testified that Hearst did not
provide any written notice regarding disclosures to these third parties, nor did it provide Plaintiff
a means of opting out of these disclosures.  *See* Deposition of James H. Murphy, ("Murphy
Dep.") Ex. A, at 375:21-376:3 ("Q:  [The in-magazine text] doesn't say that you could remove
your name from the lists that Hearst discloses to third parties, right?  … A:  No.  It does not say
that."); *id.* at 359-61, 367-75 (testifying that there was nothing Plaintiff could have done to
prevent her PRI from being disclosed to Acxiom, ██████████████████, Experian, or
████████).

### Hearst's Analysis Of The Michigan VRPA Does Not Conform To The Text Of The Statute

The VRPA was enacted in 1988 "to preserve personal privacy with respect to the
purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing
certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378
(West), *Boelter* Compl. Ex. A.  The VRPA is similar to its federal counterpart, the Video Privacy
Protection Act ("VPPA"), 18 U.S.C. § 2710, however, the VRPA extends protections to
consumers of "books and *other written materials*."  M.C.L. § 445.1712 (emphasis added).  It
provides that persons "engaged in the business of selling at retail, renting, or lending books or
*other written materials … shall not disclose to any person*, other than the customer, a record or
information concerning the purchase, lease, rental, or borrowing of those materials by a customer
that *indicates the identity* of the customer."  *Id.* (emphasis added).  The Act further provides that
a customer whose information is disclosed "may bring a civil action against the [disclosing]
person and may recover both … actual damages … or $5,000, whichever is greater … [and]
costs and reasonable attorney fees."  M.C.L. § 445.1715.

Notably, while the VRPA does permit disclosure of customer information in certain
limited circumstances, *see* M.C.L. § 445.1713, Hearst does not – and cannot – argue that its
disclosures of Plaintiff's PRI fit any of those circumstances.  Rather, Hearst attempts to rewrite
the statute by stating that it is "concerned with preventing *public* disclosures," not "entirely
confidential transmissions to trusted business partners at issue in this case."  Hearst's Ltr. at 2.
That position finds no support in the text of the statute, which prohibits disclosure to "any
person, other than the customer."  M.C.L. § 445.1712.

### Hearst Made False Statements And Told Half-Truths About The Record

First, Hearst states that "Plaintiff's own testimony makes clear she does not consider her
subscription to *Good Housekeeping* to be private."  Hearst's Ltr. at 2.  That is false.  Plaintiff
testified that "[w]hatever I read is for my own benefit.  It really has no bearing on anyone else,

and I think it's nobody's business."  Deposition of Josephine James Edwards ("Edwards Dep.") Ex. B, at 66-67.  Second, Hearst states that "the *only* transmissions of Plaintiff's 'Personal Reading Information' … by Hearst, were transmissions by Hearst to extensions of its workforce or third party service providers and business partners … in connection with serving Hearst's marketing business."  Hearst's Ltr. at 2.  That is also false.  As detailed above, among other things, disclosures to ███████████████████████████████████, not to service Hearst's marketing business.  Moreover, Mr. Murphy testified that Hearst ceased including magazine titles in the data it provided to Experian in 2015.  *See* Murphy Dep. at 245-248.  This makes clear that PRI did not need to be included to "service Hearst's marketing business" in the first place.[3]  Third, Hearst's bulleted list of points for which there purportedly is "***no*** evidence at all," Hearst's Ltr. at 2-3, is also false in many respects:

- Hearst states that Plaintiff's name was never rented by Hearst on any mailing list, but Hearst admits that there is testimonial evidence from Plaintiff that her name was rented by Hearst on mailing lists.  Hearst's Ltr. at 2 n.1.  That testimony is based on documents which show that the Paralyzed Veterans of America, a charitable organization, rented Hearst's customer mailing lists and Plaintiff having received junk mail from the Paralyzed Veterans of America;

- Hearst states that Plaintiff never received any junk mail as a result of any action by Hearst, *see* Hearst's Ltr. at 2, but Plaintiff produced a junk mail solicitation she received from the Paralyzed Veterans of America;

- Hearst states that there is no evidence of any disclosure prohibited by the VRPA, *see id.*, but Plaintiff has evidence of up to 83 total disclosures in violation of the VRPA;

- Hearst states that "there is no evidence … [that Plaintiff] would choose to pay less money for a magazine subscription if the magazine publisher shared the identities of the subscribers," *see id.* at 4, but Plaintiff testified at her deposition that she would not have purchased a subscription to any Hearst magazine if she knew Hearst would disclose her PRI as a result.  *See* Edwards Dep. at 192.

In short, discovery has demonstrated that Plaintiff's PRI was disclosed (and in some instances sold) up to 83 times in violation of the VRPA.  Discovery has also demonstrated that Hearst did not provide Plaintiff with any written notice of those disclosures or any means of opting out.  Hearst cannot avoid this damaging evidence by turning a blind eye to the truth.

**<u>Plaintiff Has Standing</u>**

Hearst cherry-picks language from Your Honor's order on its motion to dismiss to argue that Plaintiff must demonstrate "economic harm" to satisfy the injury-in-fact requirement of Article III standing.  Hearst's Ltr. at 3.  As Your Honor noted in denying Hearst's motion to dismiss, this Court had previously "addressed, and rejected, Defendant's argument that violation of the VRPA does not constitute an injury-in-fact sufficient to sustain standing."  *Boelter*, 2016

---

[3] Hearst seemingly deems these entities as "extensions of its workforce or third party service providers and business partners," Hearst's Ltr. at 2, but those terms have no basis in the text of the VRPA, nor does Hearst seek to reconcile these terms with the text of the VRPA.

WL 3369541, at *3; *see also Boelter v. Hearst Commc'ns, Inc.*, 2016 WL 361554, at *3 (S.D.N.Y. Jan. 28, 2016) ("[T]he VRPA creates for Plaintiff a specific, enforceable legal right to expect Defendant to keep private her identifying information … its violation constitutes a concrete, particularized deprivation. … If Defendant violated the statute by disclosing Plaintiff's personal information, it deprived Plaintiff of a right to which she was particularly entitled by law, constituting an injury-in-fact sufficient to confer standing.").[4]  Your Honor's order denying Hearst's motion to dismiss did not change that previous ruling.  Your Honor held that the Supreme Court's decision in *Spokeo v. Robins* "does not upset the Court's conclusion here that the violation of a statute by itself is insufficient to confer standing to sue but that Defendant's violation of the VRPA, as alleged, caused a concrete and particular injury to Plaintiffs."  *Boelter*, 2016 WL 3369541, at *3 n.4.  Indeed, at the conclusion of that sentence, Your Honor cited her decision on Plaintiff Boelter's motion for a preliminary injunction, which held that the violation of the VRPA alone confers Article III standing.

Moreover, Judge Buchwald of this District has also held that the violation of the VRPA alone "suffices to assert a concrete, if hard to measure, intrusion on protected privacy interests so as to give rise to injury in fact."  *Boelter v. Advance Magazine Publishers, Inc.*, 2016 WL 5478468, at *7 (S.D.N.Y. Sept. 28, 2016) ["*Condé Nast*"]; *see also id.* at *6 (analogizing to the federal VPPA to hold that disclosures to third parties without consent confer Article III standing).  And every other court to consider the question has agreed.  *See Halaburda v. Bauer Pub. Co., LP*, 2013 WL 4012827, at *4, *6 (E.D. Mich. Aug. 6, 2013); *Kinder v. Meredith Corp.*, 2014 WL 4209575, at *2 (E.D. Mich. Aug. 26, 2014); *Owens v. Rodale, Inc.*, 2015 WL 575004 (E.D. Mich. Feb. 11, 2015), at *4; *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 683 (E.D. Mich. 2013); *Deacon v. Pandora Media, Inc.*, 901 F. Supp. 2d 1166, 1172 (N.D. Cal. 2012); *see also Coulter-Owens v. Time, Inc.*, 2016 WL 612690, at *5 (E.D. Mich. Feb. 16, 2016) (declining to revisit the issue of whether statutory injury under the VRPA confers Article III standing on motion for summary judgment).

Additionally, the Second Circuit's recent decision in *Strubel v. Comenity Bank*, -- F.3d --, 2016 WL 6892197 (2d Cir. Nov. 23, 2016), provides yet another basis by which Plaintiff has standing.  In *Strubel*, the Second Circuit held "[w]e do not understand *Spokeo* categorically to have precluded violations of statutorily mandated procedures from qualifying as concrete injuries supporting standing."  *Id.* at *4.  Rather, the Second Circuit "understand[s] *Spokeo* … to instruct that an alleged procedural violation can by itself manifest concrete injury where [the legislature] conferred the procedural right to protect a plaintiff's concrete interests and where the procedural violation presents a 'risk of real harm' to that concrete interest."  *Id.* at *5.  Applying that principle, the Second Circuit held that the failure to provide a plaintiff with notice of his statutory rights under TILA was a sufficient injury to confer Article III standing because "[a] consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him."  *Id.*; *see also id.* at *7 ("[W]e can reasonably assume that defective notices about a consumer's own obligations raise a sufficient degree of real risk that the unaware consumer will not meet those obligations, with ensuing harm to, if not loss of, rights under credit agreements.").

---

[4] Hearst's argument is also belied by the fact that Your Honor held that because the violation of the VRPA confers Article III standing, the Court "need not address" whether other forms of economic injury "independently constitute[] an injury in fact."  *Boelter*, 2016 WL 361554, at *3 n.4.

Here, like in *Strubel*, Hearst failed to provide Plaintiff with notice that Hearst was
disclosing her PRI to third parties, and failed to provide Plaintiff with the ability to "remove her
name at any time by written notice" to the defendant, as required by the VRPA.  M.C.L. §
445.1713(d).  Hearst's failure to provide notice that it was disclosing PRI to third parties, and its
failure to provide plaintiff with the ability to "remove her name at any time by written notice" to
Hearst, made it increasingly likely that Plaintiff would not exercise her rights under the VRPA to
stop Hearst from disclosing her PRI to third parties, and resulted in the "loss of" her rights under
the VRPA up to 83 times.  *See Strubel*, 2016 WL 2016 WL 6892197, at *7.  In sum, Hearst's
failure to provide Plaintiff with the VRPA's required notice and opt-out mechanism is directly
analogous to *Strubel*, and the Second Circuit's holding in *Strubel* thereby provides another basis
by which Plaintiff has Article III standing.  *See also Condé Nast*, 2016 WL 5478468, at *6 ("The
harm resulting from failing to satisfy [the VRPA's] notice requirement is not simply lack of
notice itself, but denial of the right to prevent disclosure. … If … [Defendant] failed to give
[Plaintiff] notice and an opportunity to opt out, then disclosure of her PRI would have violated
the PPPA's[5] substantive disclosure prohibition.").[6]

## Summary Judgment

Plaintiff also intends to oppose Hearst's forthcoming motion for summary judgment with
respect to Plaintiff's claims, and seeks permission to bring her own motion for summary
judgment based on the evidence supporting her allegations thus far.  Plaintiff agrees with Hearst
that its Rule 12 motion should be briefed concurrently with the parties' motions for summary
judgment.  After conferring with Hearst's counsel[7], the parties jointly propose the following
schedule for the Court's consideration:

- January 13, 2017:  Parties to exchange proposed 56.1 statements;
- February 10, 2017:  Parties to exchange any counter 56.l statements;
- February 24, 2017:  Parties to submit to the Court their summary judgment letters, along
  with 56.1 statements

Furthermore, Plaintiff will oppose Hearst's motion for summary judgment on the
following grounds:

- First, there is evidence in the record that Hearst disclosed "a record or information
  concerning the purchase" by Plaintiff of subscriptions to *Good Housekeeping*, *Oprah*,
  *Redbook*, and *Woman's Day* magazines.  Documentary evidence confirms that Hearst
  transmitted Plaintiff's PRI, as well as whether her subscription was purchased directly from
  the publisher, whether her subscription was paid for, and whether she was a multiple time

---

[5] Judge Buchwald referred to the VRPA as the PPPA, following the lead of the Michigan Supreme Court.  *See
Condé Nast*, 2016 WL 5478468, at *3 n.3.
[6] Even if a violation of the VRPA alone did not confer Article III standing, Plaintiff also testified at her deposition
that she would not have purchased a subscription to any Hearst magazine if she knew Hearst would disclose her PRI
as a result.  *See* Edwards Dep. at 192.  Courts have found similar evidence sufficient to confer Article III standing.
*See In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1223-24 (N.D. Cal. 2014) (allegations that the
plaintiffs "personally spent more on Adobe products than they would had they known Adobe was not providing the
reasonable security Abode represented it was providing" conferred Article III standing).
[7] Hearst's letter proposed a slightly different schedule, but the parties now seek to proceed under this new schedule
given the upcoming holidays, and the unavailability of Dunn Data for a deposition until January 2017.

buyer.  Documentary evidence also confirms that Hearst, through Acxiom, maintains records of whether subscriptions were purchased as a donation.

- Second, the transmissions of Plaintiff's PRI were prohibited disclosures under the VRPA. Contrary to Hearst's argument, there is no exception under the VRPA for disclosure to third parties acting as agents. The plain language of the statute states that companies shall not disclose protected information "to *any person*, other than the customer." M.C.L. § 445.1712 (emphasis added).  Furthermore, contrary to Hearst's assertion, these transmissions were not made to "employees" or "agents."  Indeed, Hearst's contracts with Acxiom, ████, and Experian make clear that they are not Hearst's agents.  *See Fed. Ins. Co. v. Detroit Med. Ctr.*, 2009 WL 136866, at *9 (E.D. Mich. Jan. 16, 2009) ("Agency is a question of law when based on an unambiguous contract."); *Potomic Leasing Co. v. The French Connection Shops, Inc.*, 172 Mich. App. 108, 113 (1988) (finding no genuine issue of material fact regarding agency where parties' contract specifically disclaimed any agency relationship).[8]

- Third, documentary and testimonial evidence from Hearst's 30(b)(6) designee demonstrates that Plaintiff subscribed to *Good Housekeeping*, *Oprah*, *Woman's Day*, and *Redbook* magazines directly from Hearst, i.e. "at retail", at least 19 times.  *See* Murphy Dep. at 225. And every disclosure of Plaintiff's PRI predates her October 2015 subscriptions purchased through Living Social.

- Finally, the VRPA as applied to Plaintiff's individual claims does not violate the First Amendment.  As Your Honor held, Hearst's speech at issue is commercial speech.  *See Boelter*, 2016 WL 336541, at *9 ("Defendant's speech is commercial in nature."); *Condé Nast*, 2016 WL 5478468, at *13 (same).  Moreover, discovery has revealed that Hearst ████ ███████████████████████████████████████████ further evidencing its speech is commercial in nature.  Plaintiff also testified that she regards her subscription to *Good Housekeeping* magazine as private, and the State of Michigan has an interest in "regulating the dissemination of consumer data."  *Boelter*, 2016 WL 336541, at *9.[9]

---

[8] Hearst argues that this reading of the VRPA would render the law "untenable" because it would "render Hearst liable for using a print house to prepare subscription address labels, or even for providing addressed magazines to the Post Office for subscription fulfillment."  Hearst's Ltr. at 5.  Of course, Plaintiff is not suing Hearst for providing her PRI to a print house or the Post Office.  She is suing Hearst for disclosing (and sometimes selling) her PRI to data companies.

[9] Hearst also argues that "Plaintiff has failed to come forward with any evidence that Hearst was unjustly enriched by any purported 'disclosure' of her Personal Reading Information."  Hearst's Ltr. at 6 n.7.  That is wrong.  Plaintiff has discovered evidence that ████████████████████████.
Moreover, Hearst boasts that it failed to meet its discovery obligations and comply with its duties to the Court.  *See id.* ("[N]or did [Plaintiff] ever seek to compel disclosure of information it believed it had sought and had not received.").  That is not conduct that should be rewarded.

BURSOR&FISHER
P.A.

Very truly yours,

Joseph I. Marchese

Encls.

CC:     All counsel of record (via ECF and email)

**EXHIBIT A**

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

JOSEPHINE JAMES EDWARDS,

individually and on behalf of

all others similarly situated,

      Plaintiffs,

  vs.                        Civil Action No.

                            15-cv-09279-AT

HEARST COMMUNICATIONS, INC.

      Defendant.

--------------------------------x

CONFIDENTIAL

VIDEOTAPE DEPOSITION OF JAMES H. MURPHY

New York, New York

November 10, 2016

9:25 a.m.

Reported by:
Maureen Ratto, RPR, CCR
Job No. 47399

1          MURPHY - CONFIDENTIAL

2      the Kipling Avenue address.

3      Q.   So the ID ending in 63000 is

4      her Kipling Address?

5      A.   Excuse me. That is her 12

6      Mile Road address.

7      Q.   Okay. That's her 12 Mile Road

8      address and the one ending -58000 is

9      her -- which address?

10     A.   It's her Kipling Avenue

11     address.

12     Q.   So for the orders at the 12

13     Mile address, there are 4 of the 23

14     that you believe may involve a third

15     party but you can't identify the

16     third party, right?

17     A.   There's one that I know is

18     from a third party and three whose

19     status I am not sure of.

20     Q.   And there are 19 orders that

21     you know did not involve a third

22     party, right?

23     A.   Yes. That is correct.

24     Q.   Now, I want to ask you some

25     questions about the information that

245

1          MURPHY - CONFIDENTIAL

2              (Deponent reviews the

3      document.)

4       A.   It's an e-mail that details

5      information as pertains to

6      individuals residing in the State of

7      Michigan.

8       Q.   So Ms. James Edwards resided

9      in the State of Michigan, right?

10      A.   Yes, she did.

11      Q.   And Hearst transmitted her

12     information to Experian in 2011. You

13     just testified to that, right?

14      A.   That is correct.

15          MS. FINDIKYAN:  Objection to

16     form.

17      Q.   And then again in 2012, 2013

18     and 2014, each year Hearst

19     transmitted Ms. James Edwards'

20     information to Experian through

21     2014, right?

22          MS. FINDIKYAN:  Objection to

23     form.

24      A.   If you mean it in terms of

25     Personal Reading Information, yes.

JAMES H. MURPHY - CONFIDENTIAL

246

1          MURPHY - CONFIDENTIAL

2     Q.   And then you got this e-mail

3     from Hearst's lawyers, that's

4     Exhibit 44, right?

5     A.   This is not an e-mail from

6     Hearst lawyers.

7     Q.   Did you write this e-mail?

8     A.   No, I did not. I wrote parts

9     of it.

10    Q.   All right. Then this e-mail

11    was created, right?  This e-mail

12    exchange occurred, right?

13    A.   I don't understand the

14    question.

15    Q.   This e-mail exchange occurred

16    in April of 2015, correct?

17         MS. FINDIKYAN:  Objection to

18    form.

19    A.   The e-mail chain begun in

20    March 30th of 2015.

21    Q.   And then after this e-mail

22    chain you stopped providing Ms.

23    James Edwards' information to

24    Experian, right?

25         MS. FINDIKYAN:  Objection to

JAMES H. MURPHY - CONFIDENTIAL

247

1        MURPHY - CONFIDENTIAL

2    form.

3    A.   We stopped sending Ms. James'

4    Personal Reading Information

5    starting with the transmission that

6    would have went out in the June of

7    '15 timeframe.

8    Q.   So in June of 2015 you still

9    transmitted some data about Ms.

10   James Edwards to Experian, right?

11        MS. FINDIKYAN:   Objection,

12   form.

13   Q.   Is that right?

14   A.   Please repeat the question.

15   Q.   Really?

16   A.   I asked you to repeat the

17   question.

18   Q.   After June of 2015 you still

19   transmitted some data about Ms.

20   James Edwards to Experian?

21   A.   We submitted her name and

22   address.

23   Q.   You only stopped giving them

24   the titles of the magazines she

25   subscribed to.  Is that right?

JAMES H. MURPHY - CONFIDENTIAL

248

1          MURPHY - CONFIDENTIAL

2      A.   Yes. That is correct.

3      Q.   Do you see the first e-mail

4    in this chain is from Charles Swift

5    on March 30?  Starts on the second

6    page.

7      A.   Yes. I see it.

8      Q.   And he says, "While we are

9    still discussing the specifics I

10   wanted to make sure everyone was

11   aware of our latest directive on

12   information sharing as it relates to

13   individuals residing in the State of

14   Michigan." Do you see that?

15     A.   Yes.

16     Q.   Was there a prior directive

17   that preceded this one?

18          MS. FINDIKYAN:  Objection to

19   form.

20     A.   Not that I'm aware of.

21     Q.   Was this e-mail from

22   Mr. Swift the first you'd heard

23   about some concern about the

24   information of people in Michigan?

25          MS. FINDIKYAN:  Objection to

JAMES H. MURPHY - CONFIDENTIAL

359

1        MURPHY - CONFIDENTIAL

2    receive mailings and based on the

3    do-not-promote flag being sent to

4    ███████  they were not getting mail.

5    Q.   So there is nothing they

6    could do to prevent the disclosure

7    to ███████, isn't that true?

8          MS. FINDIKYAN:   Objection to

9    form.

10         THE WITNESS:   Could you

11   please restate the question?

12         (Pending question is read

13   back by the reporter.)

14   A.   It depends on the time

15   period.

16   Q.   In 2011.

17         MS. FINDIKYAN:   Objection to

18   form.

19   A.   In 2011, no, there was not

20   that option.

21   Q.   In 2012?

22         MS. FINDIKYAN:   Objection to

23   form.

24   A.   It depends on the customer.

25   Q.   Why does it depend on the

JAMES H. MURPHY - CONFIDENTIAL

360

MURPHY - CONFIDENTIAL

1

2       customer?

3        A.   There is different logic and

4       different titles to which we send

5       ██████.

6        Q.   But there is no response to

7       this notice that they could make

8       that's going to have any effect on

9       whether their name is disclosed to

10      ██████   and the titles?

11       A.   If they fit the specific

12      criteria that ██████, in the

13      timeframe -- or this is a living

14      breathing document, there are times

15      if a customer qualifies there is no

16      way for them to turn that off.

17          MS. FINDIKYAN:  And objection

18      to the form of that question.

19       Q.   And there is no way to turn

20      off the disclosure to ████████

21      either, isn't that true?

22          MS. FINDIKYAN:  Objection to

23      form.

24       A.   I'd have to review the logic.

25       Q.   What do you want to see on

JAMES H. MURPHY - CONFIDENTIAL

361

1          MURPHY - CONFIDENTIAL

2     the logic on ███████?

3      A.   Can you scroll to the top?

4     Could you repeat the question.

5      Q.   There is nothing a customer

6     can do to prevent Hearst from

7     disclosing their PRI to ██████,

8     isn't that true?

9          MS. FINDIKYAN:  Objection to

10     form.

11     A.   If they were eligible for the

12     criteria stated in the ████████

13     extract there is nothing they could

14     have done to prevent us sending

15     that.

16     Q.   And there is nothing the

17     customer can do to prevent Hearst

18     from disclosing their PRI to Acxiom,

19     isn't that true?

20          MS. FINDIKYAN:  Objection to

21     form.

22     A.   As I stated previously,

23     Acxiom is hosting a consumer

24     marketing database on behalf of

25     Hearst. They are an extension of

JAMES H. MURPHY - CONFIDENTIAL

367

1           MURPHY - CONFIDENTIAL

2       worth of expires.

3           So for the Good Housekeeping

4       subscription for ███ , which was the

5       last one of the addresses that were

6       on file for the, Ms. Edwards at 12

7       Mile Road, she expired in March of

8       2010. So two years expire would have

9       taken us to March of 2012.

10          So somewhere between the

11      timeframe of June and March -- June

12      of '11 to March of '12 would have

13      been when she would have been

14      eligible.  So it was up to nine

15      times. And I'd have to look or

16      further refine based on the mag

17      categories to further make that

18      statement.

19       Q.   And whatever search you did

20      at Hearst failed to find any of

21      those nine transmissions, right?

22          MS. FINDIKYAN:  Objection to

23      form.

24       A.   Can you repeat the question?

25       Q.   Whatever search you did at

JAMES H. MURPHY - CONFIDENTIAL

368

1      MURPHY - CONFIDENTIAL

2   Hearst failed to find any of those

3   nine transmissions, isn't that

4   right?

5          MS. FINDIKYAN:  Same

6   objection.

7    A.   As I stated multiple times

8   previously, these types of extracts

9   are not archived. So no, we didn't

10   have a copy of said transmission.

11   There is no practical business value

12   for us to retain this.

13    Q.   And no matter what Ms. James

14   Edwards did in response to this

15   notice in the Good Housekeeping

16   Magazine, you were still going to

17   disclose her name, address and

18   magazine titles to ███, isn't that

19   right?

20          MS. FINDIKYAN:  Objection to

21   form.

22    A.   I don't know if we disclosed.

23   I said she was eligible to be

24   disclosed.

25    Q.   You don't know because Hearst

JAMES H. MURPHY - CONFIDENTIAL

369

1          MURPHY - CONFIDENTIAL

2     destroyed all the records of the

3     transmission, isn't that correct?

4          MS. FINDIKYAN:  Objection to

5     form.

6     A.   "Destroy" has a negative

7     connotation. Our business is not to

8     retain those records.  There is no

9     practical business value to keep a

10    copy of this.

11    Q.   You get rid of those records

12    immediately after you make the

13    transmission, right?

14         MS. FINDIKYAN:  Objection to

15    form.

16    A.   After -- as I said, the files

17    are posted.  I think the standard

18    Acxiom practice is to have a file

19    out in FTP for seven days and that

20    file is purged after that seven-day

21    period.

22    Q.   But you believe there were

23    nine such transmissions?

24         MS. FINDIKYAN:  Objection to

25    form.

JAMES H. MURPHY - CONFIDENTIAL

370

MURPHY - CONFIDENTIAL

A.   I said I believe there was --
there was -- I believe there is nine
transmissions. She was eligible to
be pulled in up to nine of those.

Q.   Just in the nine month period
prior to March of 2012?

A.   Right. And then her logic
would definitively cease to have her
eligible.

Q.   So -- and that transmission
was going to happen no matter what
she did in response to this notice
in Good Housekeeping Magazine, isn't
that right?

MS. FINDIKYAN:  Objection,
form.

A.   If she was eligible for the
criteria there was nothing that she
could have done to stop that
transmission.

Q.   And no matter what she did in
response to this notice Hearst was
still going to disclosure her PRI to
Experian, isn't that true?

JAMES H. MURPHY - CONFIDENTIAL

371

1      MURPHY - CONFIDENTIAL

2          MS. FINDIKYAN:  Objection to

3      form.

4      A.   As I stated, you know,

5      Experian is much like, you know,

6      part of our ecosystem and the need

7      to understand, you know,

8      demographics for everything from

9      editorial to advertising to

10     marketing purposes, we send that

11     name. So her PRI, as we've gone

12     through, was disclosed as part of an

13     annual refresh to Experian.

14     Q.   That was going to happen

15     every year no matter what she did,

16     right?

17         MS. FINDIKYAN:  Objection to

18     form.

19     A.   If -- if she was eligible or

20     deemed eligible, she would have --

21     there is nothing she could have done

22     to disclose it just like, you

23     know --

24     Q.   There is nothing that she

25     could have done to prevent the

JAMES H. MURPHY - CONFIDENTIAL

372

1           MURPHY - CONFIDENTIAL

2      disclosure?

3       A.   Just like when we are

4      servicing her subscription and we

5      send it to -- that label to the

6      printer to be included, just like,

7      you know, as part and parcel of the

8      subscription, we are sending that to

9      Experian.

10      Q.   That is the exact same thing

11     as sending it to Experian to find

12     out if she's a democrat, right? Just

13     like sending it to the post office

14     to mail it to her?

15          MS. FINDIKYAN:  Objection to

16     form.

17      A.   It allows us to, you know,

18     provide a better product to her. We

19     were able to understand, you know,

20     in terms of, you know, what she

21     might like, what her interests are

22     inform in aggregate the editors of

23     what type of content to create,

24     former customers, we may see

25     triggers within the demographics

JAMES H. MURPHY - CONFIDENTIAL

373

1        MURPHY - CONFIDENTIAL

2     that might state, you know, hey, we

3     lost them and they moved or, you

4     know, they might be, you know,

5     entering a different life stage and

6     another one of our magazines might

7     be of interest to her.

8       Q.   No matter what Josephine

9     James Edwards did in response to

10    this notice in Good Housekeeping

11    Magazine, no matter what she did,

12    writing to you in Red Oaks, Iowa --

13    is it Red Oaks, Iowa? Yeah. There is

14    no way that she could have stopped

15    Hearst from disclosing her PRI to

16    █████, isn't that true?

17         MS. FINDIKYAN:  Objection to

18    form.

19      A.   I don't think we've

20    established that Ms. James was ever

21    disclosed to █████.

22      Q.   Was she disclosed to █████?

23      A.   No, she has not.

24      Q.   How do you know that?

25      A.   As stated in the

JAMES H. MURPHY - CONFIDENTIAL

374

1      MURPHY - CONFIDENTIAL

2    interrogatory number 4, we do not

3    believe she was disclosed.

4     Q.   Well, the people at █████

5    told us that she was.

6         MS. FINDIKYAN:  Objection to

7    form.

8     A.   I can't state what ██████,

9    you know --

10    Q.   You don't know one way or the

11   other because Hearst didn't keep any

12   records of the disclosures, right?

13        MS. FINDIKYAN:  Objection to

14   form.

15    A.   We have fairly good records

16   in terms of what our logic was and

17   we do not believe -- we are

18   confident that Ms. Edwards'

19   information was not disclosed to

20   █████ by Hearst.

21    Q.   How did you determine that?

22    A.   Looking at contracts that we

23   have in place with █████, talking

24   to the individuals who engaged the

25   █████ relationship, looking at

JAMES H. MURPHY - CONFIDENTIAL

375

1        MURPHY - CONFIDENTIAL

2    extract rules of PCR that we had

3    with Acxiom to create said extract.

4        MR. BURSOR:  Let's take a

5    short break.

6        VIDEOGRAPHER:  Time is 19:02.

7    We are off the record.

8        (Recess is taken.)

9        VIDEOGRAPHER:  Time is 19:16.

10   We are on the record.

11   Q.   Boy, I hate to ask you to do

12   this again, but what page was that

13   disclosure on in Exhibit 55?

14       Mr. MILIAN:  Page 212.

15   A.   Page 212.

16   Q.   On page 212 it says, "If you

17   would rather not receive such

18   mailings", and then it tells you to

19   send something in, right?

20   A.   That is correct.

21   Q.   All right. But it doesn't say

22   that you could remove your name from

23   the lists that Hearst discloses to

24   third parties, right?

25       MS. FINDIKYAN:  Objection,

JAMES H. MURPHY - CONFIDENTIAL

376

1          MURPHY - CONFIDENTIAL

2     form.

3      A.   No.  It does not say that.

4      Q.   Now, I want to -- how long

5     does it take from the time when a

6     customer subscribes to the time that

7     their subscription information gets

8     updated into the Hearst database

9     maintained by Acxiom?

10          MS. FINDIKYAN:  Objection to

11     form.

12     A.   Depends.

13     Q.   What does it depend on?

14     A.   There has been different data

15     flows in place at various times

16     between the systems.

17     Q.   All right. So if a customer

18     subscribes through direct mail

19     offer, how long would it take the

20     information to get put into the

21     database?

22     A.   Which database?

23     Q.   The one maintained by Acxiom.

24          MS. FINDIKYAN:  Objection to

25     form.

**EXHIBIT B**

```
 1
 2              UNITED STATES DISTRICT COURT
 3          FOR THE SOUTHERN DISTRICT OF NEW YORK
 4      ----------------------------X
        SUZANNE BOELTER, individually   No. 1:15-cv-03934-AT-JLC
 5      and on behalf of all others
        similarly situated,
 6
                     Plaintiff,
 7             v.
 8      HEARST COMMUNICATIONS, INC.,
 9                   Defendant.
        ----------------------------X
10      JOSEPHINE JAMES EDWARDS,
        individually and on behalf of   No. 1:15-cv-02979-AT-JLC
11      all others similarly situated,
12                   Plaintiff,
               v.
13
        HEARST COMMUNICATIONS, INC.,
14
                     Defendant.
15      ----------------------------X
16            * C O N F I D E N T I A L  *
17
18             VIDEOTAPED DEPOSITION
19                      OF
20             JOSEPHINE JAMES EDWARDS
21               New York, New York
22           Friday, September 30, 2016
23
24      Reported by:
        ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25      JOB NO. 113082
```

1           J. J. Edwards - Confidential

2       A.    No.

3       Q.    Is it something that you would hide

4   from others?

5             MR. MARCHESE:  Objection to form.

6       A.    No.

7       Q.    Okay.  Is the fact that you were a

8   Good Housekeeping magazine subscriber a secret?

9             MR. MARCHESE:  Objection to form.

10      A.    It's just never come up.

11      Q.    Okay.  But would you consider it a

12  secret?

13      A.    No.

14      Q.    Would you consider it an intimate,

15  private fact about you?

16            MR. MARCHESE:  Objection to form.

17  Compound.

18      A.    Well, what I read is really nobody's

19  business.  It's nobody's business.

20      Q.    I understand.  But is it an intimate,

21  private fact about you?

22            MR. MARCHESE:  Objection to form.

23  Compound.  Asked and answered.

24      A.    Whatever I read is for my own

25  benefit.  It really has no bearing on anyone

1              J. J. Edwards - Confidential

2    else, and I think it's nobody's business.

3         Q.   Are you concerned that other people

4    might know that you're a Good Housekeeping

5    subscriber or were a Good Housekeeping

6    subscriber?

7              MR. MARCHESE:  Objection to form.

8         A.   No.  I just think it's my own

9    personal reading choice, and nobody needs to

10   know what I read.

11        Q.   Do you take steps to make sure that

12   nobody knows that you're a Good Housekeeping

13   subscriber?

14        A.   Well, I don't --

15             MR. MARCHESE:  Objection to form.

16        A.   -- I don't keep it hidden, if that's

17   what you're asking.

18        Q.   Right.

19             You did publicly file this lawsuit

20   noting that you're a good subscriber, right?

21        A.   Right.  Um-hmm.  Yes.

22        Q.   You didn't choose to file this as a

23   Jane Doe lawsuit to protect that fact from the

24   public, did you?

25        A.   Correct.

1          J. J. Edwards - Confidential

2     statutory privacy protections.

3               Is that an accurate summary?

4     A.     It is.

5     Q.     And that you would not have been

6     willing to pay as much as you did, if at all, if

7     you had known that Hearst would disclose your

8     personal reading information.

9               What would you have been willing to

10    pay for a subscription to Good Housekeeping

11    magazine without the statutory privacy

12    protection?

13              MR. MARCHESE:  Object to the form.

14    A.     I would not have subscribed.

15    Q.     So you would not have subscribed at

16    any price?

17    A.     Correct.

18    Q.     You wouldn't have subscribed even if

19    the magazine was free?

20    A.     Not if they're using my information.

21    Q.     So is it your view you can't put a

22    price on that, the lack of privacy protection

23    under the state law?

24              MR. MARCHESE:  Objection to form.

25    A.     Can you rephrase the question?  I

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JOSEPHINE JAMES EDWARDS, individually
and on behalf of all others similarly situated,

Plaintiff,

v.

HEARST COMMUNICATIONS, INC.,
Defendant.

No. 1:15-cv-09279-AT-JLC

## DEFENDANT HEARST COMMUNICATIONS, INC.'S
## FOURTH AMENDED OBJECTIONS AND RESPONSES TO
## PLAINTIFF JOSEPHINE JAMES EDWARD'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 33, Hearst Communications, Inc. ("Hearst")

provides amended responses to Plaintiff Josephine James Edwards's First Set of Interrogatories

("Interrogatories") as follows:

## GENERAL OBJECTIONS

Hearst makes the following General Objections to Plaintiff's Interrogatories.  Hearst

reserves the right to supplement, amend, or qualify these General Objections.

1.      Hearst objects to Plaintiff's Requests as premature, overbroad, and unduly

burdensome to the extent that they seek documents or information other than those pertaining to

Plaintiff Josephine James Edwards's individual claims and any defenses thereto.  Subject to and

without waiver of the foregoing objection, based on the representations of Plaintiff Josephine

James Edwards's counsel, Hearst will construe "Plaintiff" as, and will provide responses and

produce documents and information with respect to, a Josephine James (a/k/a Josephine James

Edwards) who has been sent, based on the representations of counsel, *Good Housekeeping*

**CONFIDENTIAL**

magazines at the address 3681 Kipling Ave., Berkley, Michigan 48072 , 2617 12 Mile Road,

Berkley, Michigan 48072, and/or 12343 Burtley Drive, Sterling Heights, Michigan 48313.

    2.      Hearst objects to Plaintiff's Interrogatories because, as written, they are

overbroad, unduly burdensome, oppressive, seek information or documents not relevant to

Plaintiff's claims or any defenses by Hearst to Plaintiff's claims, and are not reasonably

calculated to lead to the discovery of admissible evidence.

    3.      Hearst objects to Plaintiff's Interrogatories as overbroad, unduly burdensome, and

oppressive and seeking information not commensurate with Plaintiff's legitimate discovery

needs to the extent they purport to require the production or identification or "any" or "all"

information.  In responding to the Interrogatories, Hearst will identify those individuals most

knowledgeable with respect to the requested information.

    4.      Hearst objects to Plaintiff's Interrogatories to the extent they seek information or

documents protected from disclosure by privileges and other protections from production

(hereinafter, "Privileged Information"), including, without limitation, the attorney-client

privilege, the work-product doctrine, joint-defense or common-interest privilege, or any other

constitutional, statutory, common-law or regulatory protection, immunity or proscription from

disclosure.  Hearst does not intend the inadvertent production of any Privileged Information to

constitute a waiver of Hearst's rights to assert any applicable privilege or protection with respect

to any such information or any other matter.

    5.      Hearst objects to Plaintiff's Interrogatories to the extent they demand information

or documents whose disclosure would violate any law, a court order, or the rights of any third

party, including, but not limited to, any rights conferred upon any third party in connection with

any agreement between such third party and Hearst.

CONFIDENTIAL

6.      Hearst objects to Plaintiff's Interrogatories to the extent they seek confidential or proprietary business information, trade secrets or commercially sensitive information that is otherwise subject to production (hereinafter, "Confidential Information").  Hearst will produce such information and documents containing Confidential Information pursuant to and subject to the Confidentiality Agreement and Stipulated Protective Order entered in this action (ECF No. 42).

7.      Hearst objects to the term "Hearst" as vague and ambiguous, overbroad, and unduly burdensome, and to the extent that it seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence.  Hearst construes the term "Hearst" throughout its responses as Defendant Hearst Communications, Inc., and those subsidiaries, divisions, magazines, officers, directors, employees, and any other persons who acted on its behalf relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims during the Relevant Time Period.

8.      Hearst objects to Plaintiff's Interrogatories to the extent they demand information or documents not in its possession, custody, or control.

9.      Hearst objects to Plaintiff's Interrogatories to the extent they seek information or documents already within Plaintiff's possession, custody, or control; or information or documents publicly available or otherwise available to Plaintiff from other sources equally convenient, less burdensome or less expensive.

10.     Hearst objects to Plaintiff's Interrogatories to the extent they seek information, specifically including, but not limited to, information from electronically stored information

**CONFIDENTIAL**

("ESI") located in sources that are not reasonably accessible in light of the burdens and costs required to locate, restore, review, and produce whatever responsive information may be found.

11.     Hearst objects to Plaintiff's Interrogatories to the extent they purport to impose an obligation on Hearst to create and maintain wholly new documents, or other capture of audio, visual and/or other digital communications, solely for the purpose of discovery in the litigation, where communications are not otherwise recorded or captured in the ordinary course of Hearst's business. Examples of such communications include, but are not limited to, telephone conversations, audio and/or video conferences, instant messages, text messages and meetings.

12.     Hearst objects to Plaintiff's Interrogatories to the extent that they are unreasonably cumulative, duplicative and/or intended to harass.

13.     Hearst objects to Plaintiff's Interrogatories to the extent that they assume facts not in evidence or reflect or call for legal conclusions or legal obligations that have not been established. The disclosure of any information or documents by Hearst shall not be construed as an acknowledgment of, or agreement with, any legal or factual conclusions asserted by Plaintiff.

14.     Hearst objects to Plaintiff's Definition 3 (of "Hearst Magazines") as vague and ambiguous, overbroad and unduly burdensome, and as seeking information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, Hearst construes the terms "*Good Housekeeping*" and "Hearst Magazines" to mean the U.S. print edition of *Good Housekeeping* magazine.

15.     Hearst objects to Plaintiff's Definition 5 (of "subscribe") as vague and ambiguous, overbroad and unduly burdensome, and seeking information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably

CONFIDENTIAL

calculated to lead to the discovery of admissible evidence. For clarity, throughout these responses Hearst will construe the person who "subscribes" or "subscribed" to a magazine to mean the person to whom a magazine is addressed for purposes of being mailed a copy of the magazine by or on behalf of the magazine's publisher.

16. Hearst objects to Plaintiff's Definition 6 (of "Personal Reading Information") as vague and ambiguous, overbroad and unduly burdensome, and as seeking information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. For purposes of its responses to these Interrogatories, Hearst will construe "Personal Reading Information" as it is defined in paragraph 2 of the Consolidated Amended Complaint and as ordered by the Court on October 11, 2016—as full name, title of magazine subscribed to, and home address.

17. Hearst objects to Plaintiff's Definition 7 (of "Class Period") as overbroad and unduly burdensome, as seeking information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence, and insofar as it either suggests or seeks to elicit a legal admission or conclusion that Plaintiff has pleaded or established a certifiable class or that she ever could do so. Subject to and without waiver of the foregoing objections, for purposes of its responses to these Interrogatories only, Hearst construes the term "Class Period" to mean the time period starting on November 24, 2012 and ending on February 26, 2016. The term "Relevant Time Period" shall have the same meaning.

18. Hearst objects to the terms "disclose," "disclosure," "disclosed," and similar terms, which are defined by Plaintiff in Paragraph 4 as related to "the action of making information known" and employed throughout Plaintiff's Interrogatories, as vague and

ambiguous, and insofar as those terms either suggest or seek to elicit a legal admission or conclusion. Hearst also objects to the terms as overbroad and unduly burdensome, and as seeking information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst also objects to the terms to the extent that they purport to encompass any intraoffice or interoffice transmission by Hearst, and accordingly Hearst construes these terms to exclude any such transmissions. Hearst's responses to Interrogatories employing the terms, and its responses otherwise using the terms, specifically incorporate this General Objection, and may not be construed or cited as an admission or concession as those terms are employed in the Michigan Video Rental Privacy Act.

19.     Hearst objects to the terms "sale," "sold," and "sell" which are employed throughout Plaintiff's Interrogatories, as vague and ambiguous, and insofar as those terms either suggest or seek to elicit a legal admission or conclusion. Hearst also objects to the terms to the extent that they purport to encompass any intraoffice or interoffice transmission by Hearst, and accordingly Hearst construes these terms to exclude any such transmissions. Hearst's responses to Interrogatories employing the terms, and its responses otherwise using the terms, specifically incorporate this General Objection, and may not be construed or cited as an admission or concession as those terms are employed in the Michigan Video Rental Privacy Act.

20.     Hearst objects to Plaintiff's Interrogatories to the extent they demand information or documents regarding Hearst's business and activities outside the state of Michigan or regarding anyone not a Michigan resident purchaser of *Good Housekeeping*.

21.     Hearst objects to the terms "other entity" or "any entity" as vague and ambiguous, overbroad, and unduly burdensome, and to the extent that it seeks information from Hearst not

**CONFIDENTIAL**

relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst construes the term "entity" throughout its responses to exclude Hearst.

22.      Hearst objects to the term "third party" as vague and ambiguous, overbroad, and unduly burdensome, and to the extent that it seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst construes the term "third party" throughout its responses to exclude Hearst.

23.      Hearst objects to Plaintiff's Interrogatories to the extent they seek information beyond the scope of what is permitted by Local Rule 33.3(a) and (b).

24.      Hearst objects to Plaintiff's Interrogatories to the extent that they purport to impose on Hearst obligations beyond those authorized by the Federal Rules of Civil Procedure, the Local Rules of this Court, or other applicable rules.

25.      Hearst objects to the inclusion of multiple requests within single interrogatories.

26.      Hearst's responses are made without prejudice to any claims that Hearst may have with respect to the relevance, materiality, authenticity, and/or admissibility of any documents, facts or information disclosed herein. Hearst reserves all objections as to relevance, materiality, authenticity and admissibility. Hearst's production of documents or information in response to the Interrogatories shall neither waive nor prejudice any objections Hearst may later assert, including, but not limited to, objections as to the relevance, materiality, authenticity and/or admissibility of any documents or category of documents that Hearst may assert at trial.

27.      These General Objections apply to all of Hearst's responses. To the extent that specific objections are cited in a specific response, those specific objections are provided because

they are believed to be particularly applicable to a specific Interrogatory and are not to be

construed as a waiver of any General Objection applicable to information or documents falling

within the scope of the Interrogatory.

28.     Hearst's investigation into the factual background of Plaintiff's claims and

Hearst's defenses to Plaintiff's claims is ongoing and incomplete.  Accordingly, these responses

reflect only Hearst's current knowledge.  Hearst reserves its right to supplement, amend, or

modify its responses as its investigation continues and as discovery proceeds, and to rely on any

such information discovered after the time of these responses, at any time up to and including

trial.  Hearst further reserves its right to correct any responses to any Interrogatories made as a

result of mistake or inadvertence, and to assert any applicable objections at any time up to and

including trial.  Hearst does not undertake, and hereby disclaims, any obligation to supplement

beyond the obligation imposed by the Federal Rules of Civil Procedure.  Except as expressly

admitted in these responses, no facts should be taken as admitted, implied or inferred from these

responses.  Further, no inference as to the existence of any responsive information or documents

should be made from the assertion of any objection to any Interrogatories.

**CONFIDENTIAL**

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1**:  Identify all persons with knowledge of Hearst's sale, transmission, leasing, sharing, renting or other disclosure, during the CLASS PERIOD, of the PERSONAL READING INFORMATION of any individual who at any point in time subscribed to any HEARST MAGAZINE, including all persons with knowledge of any contracts and other agreements entered into between Hearst and any other entity, including but not limited to data mining, marketing and publishing companies, including but not limited to Acxiom Corporation, Meredith Corporation, Wiland, Inc., NextMark, Inc. and Midwest Living, pertaining to Hearst's sale, transmission, leasing, sharing, renting or other disclosure, during the CLASS PERIOD, of the PERSONAL READING INFORMATION of any individual who at any point in time subscribed to any HEARST MAGAZINE.

**ANSWER:**  Hearst incorporates by reference its General Objections.  Hearst further objects to this Interrogatory as overbroad and unduly burdensome to the extent that it purports to require Hearst to identify "all" persons.  Hearst further objects to this Interrogatory insofar the term "disclosure" (1) is vague and ambiguous, (2) seeks a legal conclusion and admission by tracking statutory terms and requirements, and (3) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence.  Hearst further objects to this Interrogatory insofar as the term "Personal Reading Information"  (1) is vague and ambiguous, and (2) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence.  Hearst further objects to this Interrogatory to the extent that it purports to require the production of information or

documents not within Hearst's possession, custody, or control, and to the extent that this

Interrogatory purports to require Hearst to speculate as to the knowledge of third parties.  Hearst

objects to this Interrogatory to the extent that it seeks documents or information not pertaining to

Plaintiff Josephine James Edwards's claims or the defenses thereto.

Subject to, limited by, and without waiver of the foregoing, Hearst responds as follows:

Charles W. Swift, Jr., Jim H. Murphy, Victor Kyi and Scott DeBruhl.

**INTERROGATORY NO. 2**:  Identify all persons with knowledge of any purported notice

regarding the sale, transmission, leasing, sharing, renting or other disclosure of PERSONAL

READING INFORMATION that Hearst purportedly provided to any individual who at any

point in time subscribed to any HEARST MAGAZINE.

**ANSWER:**    Hearst incorporates by reference its General Objections.  Hearst further objects to

this Interrogatory as overbroad and unduly burdensome to the extent that it purports to require

Hearst to identify "all" persons.  Hearst further objects to this Interrogatory insofar as the term

"purported notice" (1) is vague and ambiguous, and (2) seeks a legal conclusion and admission

by tracking statutory terms and requirements.  Hearst further objects to this Interrogatory insofar

as the term "disclosure" (1) is vague and ambiguous, (2) seeks a legal conclusion and admission

by tracking statutory terms and requirements, and (3) is overbroad and unduly burdensome and

seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to

Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence.

Hearst further objects to this Interrogatory insofar as the term "Personal Reading Information"

(1) is vague and ambiguous, (2) is overbroad and unduly burdensome and seeks information

from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and

**CONFIDENTIAL**

not reasonably calculated to lead to the discovery of admissible evidence.  Hearst objects to this

Interrogatory to the extent that it purports to require the production of information or documents

beyond the Relevant Time Period.  Hearst further objects to this Interrogatory to the extent that it

purports to require the production of information or documents not within Hearst's possession,

custody, or control, and to the extent that this Interrogatory purports to require Hearst to

speculate as to the knowledge of third parties.  Hearst objects to this Interrogatory to the extent

that it seeks documents or information not pertaining to Plaintiff Josephine James Edwards's

claims or the defenses thereto.

Subject to, limited by, and without waiver of the foregoing, Hearst responds as follows:

Plaintiff Josephine James Edwards (based on the allegations of the Complaint only), Charles W.

Swift, Jr., Jim H. Murphy, and CDS Global.


**INTERROGATORY NO. 3**  Identify all persons with knowledge of gross or net revenues

derived from or otherwise related to Hearst's sale, transmission, leasing, sharing, renting or other

disclosure, during the CLASS PERIOD, of any PERSONAL READING INFORMATION of

any individual who at any point in time subscribed to any HEARST MAGAZINE.

**ANSWER:**  Hearst incorporates by reference its General Objections.  Hearst further objects to

this Interrogatory as overbroad and harassing, insofar as it seeks highly sensitive, proprietary,

and confidential business information from Hearst that is not relevant to Plaintiff's claims or any

of Hearst's defenses and is not reasonably calculated to lead to the discovery of admissible

evidence.  Hearst further objects to this Interrogatory as overbroad and unduly burdensome to the

extent that it purports to require Hearst to identify "all" persons.  Hearst further objects to this

Interrogatory insofar as the term "derived from" is vague and ambiguous.  Hearst further objects

**CONFIDENTIAL**

to this Interrogatory insofar as the term "disclosure" (1) is vague and ambiguous, (2) seeks a legal conclusion and admission by tracking statutory terms and requirements, and (3) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst further objects to this Interrogatory insofar as the term "Personal Reading Information" (1) is vague and ambiguous, and (2) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst further objects to this Interrogatory to the extent that it purports to require the production of information or documents not within Hearst's possession, custody, or control. Hearst further objects to this Interrogatory as seeking Confidential Information. Hearst further objects to this Interrogatory as compound. Hearst objects to this Interrogatory to the extent that it seeks documents or information not pertaining to Plaintiff Josephine James Edwards's claims or the defenses thereto.

Subject to, limited by, and without waiver of the foregoing, Hearst responds as follows: Charles W. Swift, Jr. and Jim H. Murphy.


**INTERROGATORY NO. 4**: Identify all entities to which Hearst sold, transmitted, leased, shared, rented or otherwise disclosed, during the CLASS PERIOD, the PERSONAL READING INFORMATION of Plaintiff.

**ANSWER:** Hearst incorporates by reference its General Objections. Hearst further objects to this Interrogatory as seeking information beyond the scope of what is permitted under Local Rule 33.3(a) and (b). Hearst further objects to this Interrogatory insofar as the term "entities" is vague

and ambiguous. Hearst further objects to this Interrogatory insofar as the term "disclosed" (1) is vague and ambiguous, (2) seeks a legal conclusion and admission by tracking statutory terms and requirements, and (3) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst further objects to this Interrogatory insofar as the term "Personal Reading Information" (1) is vague and ambiguous, and (2) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst objects to this Interrogatory to the extent that it seeks documents or information not pertaining to Plaintiff Josephine James Edwards's claims or the defenses thereto. Hearst objects to this Interrogatory to the extent that it assumes that Hearst has disclosed Plaintiff's Personal Reading Information during the Class Period.

Subject to, limited by, and without waiver of the foregoing, Hearst responds as follows: Hearst currently does not disclose Michigan subscribers' Personal Reading Information. During the period beginning June 25, 2011, Hearst relied on or outsourced certain functions to a number of third party service providers or extensions of Hearst's workforce, who were provided or provided access to Josephine James Edwards's PRI to perform those functions: Acxiom Corporation, Jigyasa Analytics, LLC and its predecessor Inductis, Inc., and Merkle Inc. In addition, on information and belief, Hearst believes that during the period beginning June 25, 2011, Josephine James Edwards's Personal Reading Information met the criteria to be included in scheduled transmissions Acxiom made on Hearst's behalf to third party service providers

████████████████████████████ and Experian Marketing Solutions, Inc., and to

████████████ and ████████████

**INTERROGATORY NO. 5**:  Identify all persons in any way involved in the development, drafting or design of any Hearst policy regarding the sale, transmission, leasing, sharing, renting or other disclosure of PERSONAL READING INFORMATION that was purportedly provided to any individual who subscribed at any point in time to any HEARST MAGAZINE and whose PERSONAL READING INFORMATION was disclosed by Hearst during the CLASS PERIOD.

**ANSWER:**  Hearst incorporates by reference its General Objections.  Hearst further objects to this Interrogatory as overbroad and unduly burdensome to the extent that it purports to require Hearst to identify "all" persons.  Hearst further objects to this Interrogatory insofar as the terms "involved in development or design" and "data sharing" are vague and ambiguous.  Hearst further objects to this Interrogatory insofar as the terms "disclosure" and "disclosed" (1) are vague and ambiguous, (2) seek a legal conclusion and admission by tracking statutory terms and requirements, and (3) are overbroad and unduly burdensome and seek information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence.  Hearst further objects to this Interrogatory insofar as the term "Personal Reading Information" (1) is vague and ambiguous, and (2) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence.  Hearst further objects to this Interrogatory to the extent that it purports to require the production of information or documents not within Hearst's possession, custody, or control, and to the extent that this Interrogatory

**CONFIDENTIAL**

purports to require Hearst to speculate as to the knowledge of third parties. Hearst objects to this Interrogatory to the extent that it seeks documents or information not pertaining to Plaintiff Josephine James Edwards's claims or the defenses thereto.

Subject to, limited by, and without waiver of the foregoing, Hearst responds as follows: Charles W. Swift, Jr.

**INTERROGATORY NO. 6**: Identify all types of PERSONAL READING INFORMATION that Hearst sold, transmitted, leased, shared, rented or otherwise disclosed to any entity during the CLASS PERIOD.

**ANSWER**: Hearst incorporates by reference its General Objections. Hearst further objects to this Interrogatory as seeking information beyond the scope of what is permitted under Local Rule 33.3(a) and (b). Hearst further objects to this Interrogatory insofar as the term "Personal Reading Information" (1) is vague and ambiguous, and (2) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst further objects to this Interrogatory insofar as the term "any entity" (1) is vague and ambiguous, and (2) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Hearst objects to this Interrogatory to the extent that it seeks documents or information not pertaining to Plaintiff Josephine James Edwards's claims or the defenses thereto.

Subject to, limited by, and without waiver of the foregoing, Hearst responds as follows: During the Relevant Time Period, the entities identified in response to Interrogatory No. 4 above

-15-
**CONFIDENTIAL**

had or may have had access to the name and address of Josephine James Edwards as a subscriber to at least one Hearst-published magazine.

**INTERROGATORY NO. 7**:  Identify all persons with knowledge of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse you for payments made to satisfy the judgment.

**ANSWER**:  Hearst incorporates by reference its General Objections.  Hearst further objects to this Interrogatory as overbroad and unduly burdensome to the extent that it purports to require Hearst to identify "all" persons.  Hearst further objects to this Interrogatory to the extent that it is premature, to the extent that it is cumulative or duplicative of the information covered under Rule 26(a)(1)(A)(iv) of the Federal Rules of Civil Procedure, and to the extent that it purports to impose on Hearst obligations beyond those authorized by the Rule 26(a)(1)(A)(iv) of the Federal Rules of Civil Procedure.  Hearst further objects to this Interrogatory to the extent that it purports to require the production of information or documents not within Hearst's possession, custody, or control, and to the extent that this Interrogatory purports to require Hearst to speculate as to the knowledge of third parties.  Hearst objects to this Interrogatory to the extent that it seeks documents or information not pertaining to Plaintiff Josephine James Edwards's claims or the defenses thereto.

Subject to, limited by, and without waiver of the foregoing, Hearst responds as follows: Mark Hasson.

-16-
**CONFIDENTIAL**

**INTERROGATORY NO. 8**: State all personal information pertaining to Plaintiff that Hearst possesses, including but not limited to such information as Plaintiff's name, address, e-mail address, date of birth, social security number, educational background, employment history, financial information, physical characteristics, ethnicity and religion.

**ANSWER:**  Hearst incorporates by reference its General Objections.  Hearst further objects to this Interrogatory as seeking information beyond the scope of what is permitted under Local Rule 33.3(a) and (b).  Hearst further objects to this Interrogatory as overbroad and harassing, insofar as it seeks highly sensitive, proprietary, and confidential business information from Hearst that is not relevant to Plaintiff's claims or any of Hearst's defenses and is not reasonably calculated to lead to the discovery of admissible evidence.  Hearst further objects to this Interrogatory insofar as the terms "financial information" and "physical characteristics" (1) are vague and ambiguous, and (2) is overbroad and unduly burdensome and seeks information from Hearst not relevant to Plaintiff's claims or any defenses by Hearst to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence.  Hearst further objects to this Interrogatory as seeking Confidential Information.  Hearst further objects to this Interrogatory as compound.  Hearst objects to this Interrogatory to the extent that it seeks documents or information not pertaining to Plaintiff Josephine James Edwards's claims or the defenses thereto.

Subject to, limited by, and without waiver of the foregoing, Hearst responds as follows: See document Bates-Numbered H000014507.

**CONFIDENTIAL**

Dated:  November 15, 2016

Jonathan R. Donnellan
Kristina E. Findikyan
Stephen H. Yuhan
THE HEARST CORPORATION
    Office of General Counsel
300 West 57th Street, 40th Floor
New York, New York 10019
Tel: (212) 841-7000
Fax: (212) 554-7000
Email: kfindikyan@hearst.com
*Attorney for Defendant Hearst
Communications, Inc.*

-18-
CONFIDENTIAL

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing to be served on all counsel of record, this 15th day of November, 2016, by hand delivery and e-mail confirmation.

Kristina E. Findikyan

**CONFIDENTIAL**