**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSEPHINE JAMES EDWARDS, individually
and on behalf of all others similarly situated,

Plaintiff,

v.

HEARST COMMUNICATIONS, INC.,

Defendant.

Civil Action No. 15-cv-09279-AT-JLC

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated:  May 1, 2017

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
           jmarchese@bursor.com
           pfraietta@bursor.com

**CAREY RODRIGUEZ
MILIAN GONYA, LLP**
John C. Carey
David P. Milian*
Frank S. Hedin*
1395 Brickell Avenue, Suite 700
Miami, FL 33131
Telephone: (305) 372-7474
Facsimile: (305) 372-7475
Email: jcarey@careyrodriguez.com
           dmilian@careyrodriguez.com
           fhedin@careyrodriguez.com
*Admitted Pro Hac Vice

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ................................................................................. 1

II.    HEARST DISCLOSED PLAINTIFF'S PRI AT LEAST 104 TIMES TO 6
ENTITIES .......................................................................................... 4

     A.     Hearst Disclosed Plaintiff's PRI To Acxiom ...................................... 4

     B.     Hearst Disclosed Plaintiff's PRI To Experian ..................................... 9

     C.     Hearst Disclosed Plaintiff's PRI To ███████ ............................... 11

     D.     Hearst Disclosed Plaintiff's PRI To ███████ ............................... 14

     E.     Hearst Disclosed Plaintiff's PRI To Dunn Data ................................. 17

     F.     Hearst Disclosed Plaintiff's PRI To ███████ ............................... 20

     G.     Hearst Publicly Disclosed Plaintiff's PRI Through Hearst's
Website, buysub.com ....................................................................... 24

     H.     Overview of Hearst's Disclosures of Plaintiff's PRI ........................... 25

     J.     Hearst Did Not Provide The Statutory Notice Or Any Ability To
Opt-Out Of These Disclosures .......................................................... 27

III.    THE SUMMARY JUDGMENT STANDARD .......................................... 29

IV.    THERE IS NO GENUINE DISPUTE WITH RESPECT TO ANY FACT
MATERIAL TO ESTABLISHING THE FOUR ELEMENTS OF A
VIOLATION OF THE VRPA ............................................................... 30

     A.     Hearst Is Engaged In The Business Of Selling Magazines At Retail ...... 31

     B.     Plaintiff Subscribed To Hearst Magazines At Retail ........................... 31

     C.     Hearst Disclosed To Another Person, Other Than The Plaintiff, A
Record Or Information Concerning The Plaintiff's Subscription ............ 32

     D.     The Records Disclosed By Hearst Indicated The Plaintiff's Identity ...... 35

V.     PLAINTIFF IS ENTITLED TO STATUTORY DAMAGES ....................... 35

VI.    CONCLUSION .................................................................................. 36

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................. 29

*Brown v. Eli Lilly & Co.*,
    654 F.3d 347 (2d Cir. 2011) .................................................................... 29

*Business Trend Analysts, Inc. v. The Freedonia Grp., Inc.*,
    887 F.2d 399 (2d Cir. 1989) .................................................................... 35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................. 29

*Dawson v. County of Westchester*,
    373 F.3d 265 (2d Cir. 2004) .................................................................... 30

*Nagle v. Marron*,
    663 F.3d 100 (2d Cir. 2011) .................................................................... 30

*Psihoyos v. John Wiley & Sons, Inc.*,
    2012 WL 5506121 (S.D.N.Y. Nov. 7, 2012) ......................................... 36

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
    391 F.3d 77 (2d Cir. 2004) ...................................................................... 30

*Sicom S.P.A. v. TRS Inc.*,
    168 F.Supp.3d 698 (S.D.N.Y. Mar. 10, 2016) ................................. 30, 31

*Wilson v. Nw. Mut. Ins. Co.*,
    625 F.3d 54 (2d Cir. 2010) ...................................................................... 29

*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001) .................................................................... 35

*Zalaski v. City of Bridgeport Police Dep't*,
    613 F.3d 336 (2d Cir. 2010) .................................................................... 29

**STATUTES**

M.C.L. § 445.1711 ............................................................................................ 1

M.C.L. § 445.1712 ................................................................................ 4, 31, 36

M.C.L. § 445.1713(d) ..................................................................................... 27

ii

M.C.L. § 445.1715(a) ........................................................................................................ 35, 37

**RULES**

Fed. R. Civ. P. 56 .................................................................................................................... 30

Fed. R. Civ. P. 56(c) ............................................................................................................... 29

Fed. R. Civ. P. 56(g) .......................................................................................................... 30, 37

**OTHER AUTHORITIES**

Michigan Non-Standard Jury Instr. Civil § 32:10 (2015).................................................. 31, 32, 35

## I.   INTRODUCTION

Hearst Communications Inc. ("Hearst") has been caught red-handed disclosing Plaintiff's magazine subscription records, including her name, address, and the magazine titles she purchased (her Personal Reading Information, or "PRI") 104 times to 6 third parties, at least 5 of whom acted as "middlemen" to sell or trade that information to additional third parties for direct marketing, charitable solicitations, and political campaigns.  Given the very narrow limitations the Court imposed on Phase I discovery, these 104 disclosures are likely just the tip of the iceberg.  The record amassed during Phase I discovery confirms that Hearst established a sophisticated network of third-party data-mining companies to store and transmit its subscribers' Personal Reading Information (PRI) to anyone that would pay for it.  Hearst did this on a routine, automated basis, for all subscribers, for years.  And Hearst did this without any regard to its obligations under the Michigan Preservation Of Personal Privacy Act, M.C.L. §§ 445.1711, *et seq.* (the "VRPA").  Hearst also made Plaintiff's PRI publicly available through Hearst's website, buysub.com, where anyone with Plaintiff's name and address could freely access her subscription records.

Plaintiff Josephine James Edwards ("Plaintiff" or "Ms. Edwards") subscribed directly to *Good Housekeeping*, *Oprah*, *Woman's Day*, and *Redbook* magazines, all published by Hearst. "Hearst does not dispute that … Plaintiff's subscription orders were placed directly with Hearst." PSOF ¶ 2.[1]  Plaintiff produced invoices and check registers evidencing her payment for some of these subscriptions.  *See* Josephine James Edwards Decl. ¶¶ 4-6, and she testified that she "personally paid money for every one of [her] subscriptions," *id.* ¶ 9.  The records Hearst disclosed to third parties confirm that Ms. Edwards was a "subscriber" and a "buyer" of these

_____

[1] Hearst's Response To Plaintiffs' Local Rule 56.1 Statement Of Facts is cited herein as "PSOF."

magazines, and in some instances include transaction details for her "purchase," including the price paid.  *See, e.g.*, Ex. 19[2] (customer record disclosed to ███████████████ identifying Ms. Edwards as the "buyer" of magazine subscriptions to *Good Housekeeping*, *Oprah*, *Redbook*, and *Woman's Day*); Ex. 33 (customer record disclosed to ███████████████ identifying Ms. Edwards as a subscriber to *Woman's Day* magazine, and stating that Ms. Edwards paid "$9.99" for her "latest purchase").  Hearst also publicly disclosed Ms. Edwards' subscription records through Hearst's website, buysub.com, which shows that Ms. Edwards subscribed to *Good Housekeeping*, and that her "Last Payment Date" was "Dec. 1, 2008."



Declaration of Philip L. Fraietta In Support Of Plaintiff's Motion For Partial Summary Judgment ("Fraietta Decl.") Ex. A.  *See also* Part II.G, below.

---

[2] Unless otherwise noted, all Exhibits are attached to the Declaration of Joseph I. Marchese In Support Of Plaintiff's Motion For Partial Summary Judgment.

At her deposition, Ms. Edwards explained that if she had known that Hearst was going to disclose her PRI, she would not have subscribed to any of these magazines:

> Q:   What would you have been willing to pay for a subscription to Good Housekeeping magazine without the statutory privacy protection?
>
> A:   I would not have subscribed.
>
> Q:   You wouldn't have subscribed even if the magazine was free?
>
> A:   Not if they're using my information.
>
> …
>
> Q:   … Are you testifying now that it [the subscription] had no value to you without those protections?
>
> A:   The protections are more important to me than the value of the magazine.  So I don't know how you want to interpret that, but my privacy is more important than a magazine.

Deposition of Josephine James Edwards ("Edwards Dep.") at 192:9-193:25, Ex. 38.[3]

> Q:   … Is the fact that you were a Good Housekeeping magazine subscriber a secret?
>
> A:   It's just never come up.
>
> …
>
> Q:   Would you consider it an intimate, private fact about you?
>
> A:   Well, what I read is really nobody's business.  It's nobody's business.
>
> Q:   I understand.  But is it an intimate private fact about you?
>
> A:   Whatever I read is for my own benefit.  It really has no bearing on anyone else, and I think it's nobody's business.

*Id.* at 66:7-67:2.

---

[3] Objections are omitted from all deposition excerpts quoted throughout this brief.

Plaintiff moves for summary judgment on Count I of her complaint, for violation of the VRPA. This statute prohibits persons "engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings" from "disclos[ing] to any person, other than the customer," information about the customer that "indicates [her] identity." M.C.L. § 445.1712. Customers who are "identified in … information that is disclosed in violation of [the] act" may bring a civil action to recover "actual damages, including damages for emotional distress, or $5,000, whichever is greater," as well as costs and attorneys' fees. *Id.* § 445.1715.

## II. HEARST DISCLOSED PLAINTIFF'S PRI AT LEAST 104 TIMES TO 6 ENTITIES

### A. Hearst Disclosed Plaintiff's PRI To Acxiom

On October 1, 2007, Hearst entered into a contract with Acxiom Corporation ("Acxiom") to build and maintain an integrated database "that aggregates and integrates customer data feeds across Hearst Corporation's online and offline fulfillment vendors for email, online sites and magazines." Acxiom Requirements Document, Ex. 9 at ACXM0321; *see also* Ex. 10 (contract with Acxiom). To do so, Acxiom received "[s]ource feeds … from multiple Hearst operational systems [that included] individual contact information (i.e., name, address, email), transactional subscriptions/orders data, campaign data, promotional data, user registration data, and outside list prospecting data." PSOF ¶ 13 (undisputed), Ex. 9 at ACXM0314.

Acxiom's 30(b)(6) designee, James Vanthournout, testified that Hearst would send Acxiom "magazine fulfillment data" on a daily basis, and Acxiom would then update the database with those data on a weekly basis:

> Q:     And then D12 [a provision in the Acxiom requirements
>          document] says Hearst is going to give Acxiom magazine
>          fulfillment data through CDS?

4

A:      Yes.

Q:      On an ongoing basis?

A:      Yes.

Q:      Every day is how it happens?

A:      Yes.

Q:      And then once a week, Acxiom uses that daily data to
update the records?

A:      Yes.

Deposition of James Vanthournout ("Vanthournout Dep.") at 55:1-12, Ex. 5.

An Excel spreadsheet produced by Acxiom confirms that beginning May 20, 2008,

Hearst transmitted Plaintiff's PRI to Acxiom.  An excerpt from that record, Exhibit 11, is

reproduced here:

| NAME ADDRESS INFO | | | | | | | | | | NAME ADDRESS INFO LA | NAME ADDRESS INFO FIRST SEEN | |
| INDIVIDUAL_ID | NAME_ADDRESS_DIFF | ADDRESS_ID | SALUTATION | FIRST_NAME | MIDDLE_NAME | LAST_NAME | SUFFIX | BUSINESS | ADDRESS_ACTIVITY_DATE | DATA_SOURCE | MAINTENANCE_DATE | FIRST_DATE | SRC_FULL_NAME |
| 1000002952956300 | CDS+0858013121 | 100322001862060411 | | JOSEPHINE | | JAMES | | | | CDS | 12/6/2012 4:20:21 PM | 5/20/2008 6:24:39 PM | JOSEPHINE JAMES |
| 1000002952956300 | CDS+0517361598 | 100322001862060411 | | JOSEPHINE | | JAMES | | | | NCA | 12/6/2012 4:20:21 PM | 5/20/2008 6:24:39 PM | JOSEPHINE JAMES |
| 1000002952956300 | WDY+912158623 | 103084000043370011 | | JOSEPHINE | | JAMES | | | | HFM | 12/6/2012 4:20:21 PM | 8/24/2011 6:37:22 PM | JOSEPHINE JAMES |
| 1000002952956300 | WDY+017589060 | 100322001862060411 MS | | JOSEPHINE | | JAMES | | | | HFM | 12/6/2012 4:20:21 PM | 5/20/2008 6:24:39 PM | MS JOSEPHINE JAMES |
| 1000002952956300 | HFM | 100322001862060411 MS | | JOSEPHINE | | JAMES | | | | HFM | 12/6/2012 4:20:21 PM | 5/20/2008 6:24:39 PM | MS JOSEPHINE JAMES |
| 3294280009485800 | PC | 100000245163590011 | | JOSEPHINE | | JAMES | | | | PC | 10/8/2015 3:59:16 AM | 10/8/2015 3:59:16 AM | JOSEPHINE JAMES |
| 3294280009485800 | CDS+1479569756 | 100000245163590011 | | JOSEPHINE | | JAMES | | | | CDS | 10/8/2015 10:53:11 AM | 10/8/2015 3:59:16 AM | JOSEPHINE JAMES |
| 1000002952956300 | CDW | 100322001862060411 | | JOSEPHINE | | JAMES | | | | NCA | 12/6/2012 4:20:21 PM | 5/20/2008 6:24:39 PM | JOSEPHINE JAMES |
| 1000002952956300 | OSL | 100322001862060411 | | JOSEPHINE | | JAMES | | | | OSL | 12/14/2012 1:49:14 AM | 5/20/2008 6:24:39 PM | JOSEPHINE JAMES |

At some point in the week prior to December 6, 2012, Hearst transmitted Plaintiff's PRI

to Acxiom as well:

Q:      So at some point in the week prior to December 6th, 2012,
you received information on Ms. James Edwards from CDS
[a Hearst company] … that is reflected here?

A:      Yes.

Vanthournout Dep. at 173:5-10, Ex. 5.

The information transmitted from Hearst to Acxiom included Ms. Edwards' name, address, and status as a *Good Housekeeping*, *Oprah*, *Woman's Day*, and *Redbook* subscriber:

> Q:   Does this record … include information provided to Acxiom by Hearst?
>
> A:   Yes.
>
> Q:   And does this record include Josephine James Edwards' name and address?
>
> A:   Yes.
>
> Q:   Does this record disclose that Josephine James Edwards was a subscriber to *Good Housekeeping* magazine?
>
> A:   Yes.
>
> Q:   Does this record disclose that Josephine James Edwards was a subscriber to *Oprah* magazine?
>
> A:   Yes.
>
> Q:   Does this record disclose that Josephine James Edwards was a subscriber to *Woman's Day* magazine?
>
> A:   Yes.
>
> Q:   Does this record disclose that Ms. Josephine James Edwards was a subscriber to *Redbook*?
>
> A:   Yes.

*Id.* at 249:2-250:3.

Once the PRI is transmitted to Acxiom, Acxiom does two things with it.

<u>First</u>, Acxiom appends demographic data from its own databases, and also from Experian (see Part II.B, below) to the customer's record:

> Q:   And it says "Magazine enhancement data currently provided by Experian will be available for ongoing updates on a monthly and annual basis."  Do you see that?
>
> A:   Yes.

Q:      And what is "Magazine enhancement data?"

A:      Experian, it's basically demographic data that is appended
        to the Hearst subscriber base.

Q:      Appended by whom?

A:      By Experian.  Well, a combination of Experian and
        Acxiom together, in their own way.

Q:      When you say "demographic data," what do you mean by
        that?

A:      Age, income, lifestyle, a lot of model fields or elements.

*Id.* at 56:20-57:13.

On February 26, 2008, Hearst entered into a "data agreement" with Acxiom to purchase

"voter registration" data from Acxiom.  *See* Ex. 13 (Acxiom Data Agreement); PSOF ¶ 28

("Hearst does not dispute that the cited contract was signed.").  The agreement specifically

provided that Hearst "may use the data elements" appended by Acxiom for "[e]nhanced list

rental," but that Hearst was prohibited from using the data for its "own internal use."  PSOF

¶¶ 29-30 (undisputed).  The only reason Hearst agreed to purchase "voter registration" data to be

appended to customer records was to rent its customer data to political organizations:

Q:      The only thing Hearst could do with this data was use it to
        rent it out to other third parties, right?

A:      Yes.

Q:      Through list brokers?

A:      Yes.

Q:      Presumably, to rent it out to political campaigns?

A:      Yes.

Q:      What other purpose could it have?

A:      None, to me.

Vanthornout Dep. at 146:16-147:5, Ex. 5.

    <u>Second</u>, in addition to appending demographic data, Acxiom also transmitted (with such transmissions referenced as "extracting") Hearst's customer data, including PRI, to Experian, ██████ ██████ Dunn Data, and ██████ at Hearst's instruction:

> Q:    So who does the extracting?  Acxiom?
>
> A:    Yes.
>
> Q:    Why?
>
> A:    We were instructed to.
>
> Q:    By Hearst?
>
> A:    By Hearst.
>
> Q:    So Hearst instructs Acxiom to extract certain data from Hearst's database?
>
> A:    Yes.

*Id.* at 127:4-14; *see also* Ex. 14 at Ex. G (listing entities to which extracted data are transmitted).

    These extractions are transmitted to Experian, ██████ ██████ Dunn Data, and ██████ via an automated process pursuant to a scripted scheduled program:

> Q:    Who does that?
>
> A:    It's a scripted scheduled program  … .
>
> Q:    And it's automated, so it happens every month automatically?
>
> A:    The answer to the question is yes and no.  As long as Hearst is telling us to keep it going, or if they had been telling us to keep it going, the answer is yes.

Vanthornout Dep. at 128:20-129:9, Ex. 5.

> Q:    What are extracts?
>
> A:    These are data files that get pulled directly through from the data base ….  These are – Acxiom kind of put these into

> what we call automation control.  So based upon triggers
> and schedules they get pulled.

*Id.* at 126:18-127:3.

Acxiom plays no role in the fulfilment of subscriptions.  Nor does Acxiom market any goods or services directly to consumers.  It facilitates Hearst's data management and data sales practices.  Nothing else.  Hearst's only purposes for contracting with Acxiom were to have demographic data appended to customer records to make those records more valuable for rental to third parties, and to facilitate the transmission of customer data to other third parties such as Experian, ████ ████ Dunn Data, and ████████

### B.    Hearst Disclosed Plaintiff's PRI To Experian

On February 27, 2001, Hearst entered into a contract with Experian Marketing Solutions, Inc. ("Experian") under which Hearst would send Experian Hearst subscriber records on an annual basis.  PSOF ¶¶ 79, 88; Ex. 24 (contract with Experian).

Pursuant to the contract, Experian was "to overlay" data variables on "approximately 14 to 20 million names annually for Client's [Hearst's] internal usage and enhanced rental fulfillment."  PSOF ¶ 81 (undisputed).  That is, Hearst contracted with Experian to append customer records with additional data to make Hearst's mailing lists more attractive to other entities for rental.  PSOF ¶ 84 (undisputed).  That is what is meant by "enhanced rental fulfilment."

Hearst's Rule 30(b)(6) designee admitted that from 2011 through 2014, Hearst transmitted Plaintiff's PRI to Experian annually, for a total of four transmissions:

> Q:    And Hearst transmitted her information to Experian in
>       2011.  You just testified to that, right?
>
> A:    That is correct.

9

Q:    And then again in 2012, 2013 and 2014, each year Hearst transmitted Ms. James Edwards' information to Experian through 2014, right?

A:    If you mean it in terms of Personal Reading Information, yes.

Deposition of James H. Murphy ("Murphy Dep.") at 245:11-25, Ex. 2.

Hearst's Rule 30(b)(6) designee also admitted that Hearst disclosed Ms. James Edwards' PRI to Experian "for the purpose of overlaying her record with demographic data provided by Experian":

Q:    And that's what they did on Ms. James Edwards' records when Hearst disclosed it to Experian in June 2011, correct?

A:    In June 2011, Acxiom, on behalf of Hearst transmitted the PRI of Ms. James' Personal Reading Information for the purpose of overlaying her record with demographic data provided by Experian.

Q:    And that was also the reason that Ms. James Edwards' PRI was sent to Experian in 2012, right, same reason?

A:    Correct.

Q:    And the same reason for the transmission to Experian in 2013, correct?

A:    Yes.  That is correct.

Q:    And the same reason the transmission to Experian in 2014 of Ms. James Edwards' Personal Reading Information was also for that that same purpose, right?

A:    Yes.  That is correct.

*Id.* at 260:21-262:25.

Experian did, in fact, append demographic data to Ms. James Edwards' record in the Hearst customer database.  PSOF ¶ 95 ("Hearst does not dispute that Plaintiff's record in [its] database contains certain data acquired from Experian.").  Those demographic data include, for example, "political affiliation," "percentage of households with a Hispanic householder,"

10

"animal welfare contributions," "environmental contributions," and "religious contributions."
Ex. 24 at H000014535-51; *see also* Ex. 3 at HX57 ("ch_interest_politics_p"); AY81
("hispanic_alone_pct"); HV57 ("ch_interest_pets_p"); FN49 ("donates_environmental_causes");
HZ57 ("ch_interest_religion_p").

Experian plays no role in the fulfilment of subscriptions.  Nor does Experian market any
goods or services directly to consumers.  It provides "demographic overlays" for Hearst.
Nothing else.  Hearst's purpose for contracting with Experian was to have Experian append its
customer records to make Hearst's mailing lists more attractive to other entities for rental:

> Q:     The reason that Hearst has contracted with Experian to get
>        those data is so that Hearst can make its mailing list more
>        attractive to customers to whom Hearst rents those lists.
>        Isn't that correct?
>
> A:     That is one of many reasons why Hearst appends this
>        information to our database.

Murphy Dep. at 267:6-17, Ex. 2.

> Q:     Because the reason for the transmission to Experian is to
>        have data appended to the file you send and then sent back?
>
> A:     Yes.
>
> Q:     Is there any other reason for what's going on between
>        Acxiom [on Hearst's behalf] and Experian?
>
> A:     No.

Vanthournout Dep. at 66:9-18, Ex. 5.

### C.     Hearst Disclosed Plaintiff's PRI To ██████

On May 3, 2007, Hearst entered into a contract with ████████████████████████████
████████████████████     to "contribut[e] [its] customer file at the beginning of th[e] relationship
and send[] complete previous-month customer history transaction information to ██████ on a
monthly basis (collectively, the 'Company Data')."  PSOF ¶¶ 99, 102 (undisputed); Ex. 26

(contract with ███████ at 01. ███████ is a data cooperative.  PSOF ¶ 100 (undisputed).  Hearst's

Rule 30(b)(6) designee described a data cooperative as "a cooperative in which mailers can

submit subscriber information customers of their file in exchange for taking names from that

cooperative for their own prospecting efforts."  Murphy Dep. at 346:7-12; Ex. 2.

On the third Monday of each month, Acxiom, on Hearst's behalf, automatically

transmitted Hearst's customer file to ███████

> Q:    Was it on the third Monday of each month?
>
> A:    To the best of my knowledge, that was the frequency in
>       which we were sending the ███████ output.
>
> Q:    Who sent it?
>
> A:    Acxiom.
>
> Q:    Do you know who at Acxiom sent it?
>
> A:    I believe it was an automated process.

*Id.* at 348:11-21.  The software-based data-extraction rules produced by Hearst indicate that

Plaintiff's PRI was transmitted to ███████ 50 times, once per month, from January 2011 through

March 2015.  *See* Ex. 15 (H0000014950 at ███████ Tab, Row 13) ("Where MAG_CD of 'GHK'

or 'OPR', pull 84 months of expires.").

A June 7, 2014 record from ███████ file, produced by ███████ in response to subpoena,

confirms that Plaintiff's PRI was transmitted to ███████ by Hearst.  An excerpt of that record,

Exhibit 27, is reproduced here:



The record includes Plaintiff's name and address.  *Id.*  It also includes ███████████████ ████████████████████████████████████  *Id.*  The record states ████████ ████████████████████  *Id.*  The record also includes ██████████████████████ ████████████████████████████  *Id.*  Finally, the record includes ██████████████████████████████████████████████ ██████████████████████  *See* PSOF ¶ 116 ("Hearst does not dispute that the number ████████ appears on Plaintiff's Exhibits 3 and 29 [Hearst's records] for certain of Plaintiff's expired *Good Housekeeping* subscriptions.").

The contract between Hearst and ████████ states that Hearst was required to "grant ████████ a non-exclusive, royalty-free license to use Company Data for the purpose of creating the ██████████████ file and to use and to grant to other ██████████████ members the right to use the Company Data for marketing and ████████ related purposes."  Ex. 26, at 01 ¶ B(5).  In exchange, Hearst was able to "tak[e] names from that cooperative [████████ for [its] own prospecting efforts."  Murphy Dep. at 346:10-12, Ex. 2.

████████ plays no role in the fulfilment of subscriptions.  Nor does ████████ market any goods or services directly to consumers.  It is a data cooperative wherein direct-mail marketers can exchange customer information for their own prospecting efforts.

13

### D.      Hearst Disclosed Plaintiff's PRI To ████

On February 28, 2007, Hearst entered into a contract with ████████████ to "contribute its subscriber file and related transaction data" on at least a ██████ basis.  PSOF ¶¶ 117, 122 (undisputed); Ex. 30 (contract with ██████ ¶¶ 1-2.  ██████ is a data cooperative. PSOF ¶ 118 (undisputed).  The ██████ contract states that Hearst grants ██████ "permission to use" its customer data "as part of the ████████ Cooperative Database for the mutual benefit of Members."  Ex. 30 at ████████████ ¶ 1.  Paragraph 1 of the ██████ contract states:

> At a minimum, Member [Hearst] agrees to provide the following types of data: (a) Active Subscriber Name and Address; (b) Active Subscriber historical transaction data including most recent subscription amount total dollars, source of latest order, and such other data as may be agreed upon; (c) Selected Expired Subscriber name, address, and transaction information similar to that provided for active subscribers ….

*Id.*

██████ Rule 30(b)(6) witness, Ms. ████████████ testified that the purpose of a publisher providing its customer lists to ██████ is to receive a list of new prospects in return:

> Q:      Okay.  And so the purpose of a publisher providing a list of active subscribers and expired subscribers would be to receive prospects in return; is that correct?
>
> A:      That would be correct.

Deposition of ████████████ at 25:19-26:1, Ex. 31.  Members of the ██████ cooperative include many direct-mail marketers, including political organizations and charitable fundraising organizations.  PSOF ¶ 119 (undisputed).

Ms. ██████ confirmed that Hearst did in fact provide ██████ with its subscriber file and related transaction data on a ██████ basis:

> Q:      Did Hearst, pursuant to this agreement, provide to ███████ the data discussed under Section 1 entitled 'Data Contribution'?
>
> A:      Yes.

██████████ at 30:6-9, Ex. 31.

> Q:      Okay.  And how often pursuant to this agreement, would Hearst transmit that member data in Section 1 to ██████
>
> A:      They're required by contract to transmit data on a ██████ basis.
>
> Q:      Okay.  And did Hearst transmit that data to ██████ on a ██████ basis, pursuant to this agreement?
>
> A:      Yes.

*Id.* at 45:20-46:4.  Those transmissions included Plaintiff's PRI:

> Q:      Okay.  So Hearst provided Josephine James' name to ██████ correct?
>
> A:      Correct.
>
> Q:      Hearst provided Josephine James' name to ██████ as a subscriber of Woman's Day magazine; correct?
>
> A:      Correct.
>
> Q:      Hearst provided Josephine James' address to ██████ correct?
>
> A:      Correct.
>
> Q:      Hearst provided her address to ██████ as a Woman's Day subscriber; correct?
>
> A:      Correct.

*Id.* at 122:22-123:14.

██████ also produced a spreadsheet, in response to Plaintiff's subpoena, with some of the information Hearst provided concerning Plaintiff.  An excerpt of that record, Exhibit 33, is reproduced here:

| Field | customer_id | insert_date | update_date | user_data1 | user_data2 | latest_purchase_date | latest_purchase_gross_amt |
|---|---|---|---|---|---|---|---|
| Suzanne Boelter | 44419879 | 11/5/2013 9:12 | 10/9/2014 10:46 | CLG | \N | 8/3/2012 | 12 |
| Josephine Edwards | **not provided by client | 11/5/2009 18:19 | 4/7/2011 5:33 | 15 | DB | 1/2/2007 | 9.99 |
| NOTES: | Customer ID sent by client | Date consumer originally received by ████ from client | Date of most recent update for consumer received by ████ from client | Client code for publication that is source of the consumer data  CLG = Country Living  15 = Women's Day | Client defined field for "paid status code" on older files sent by client; indicated payment method on older files \N = not tracked by ████  DB = unknown | Latest purchase date for consumer provided by client | Amount of latest purchase by consumer provided by client |

This record indicates that Plaintiff subscribed to *Woman's Day* magazine, and also indicates the date and price for the "latest purchase by consumer," for which Ms. Edwards paid "$9.99."

██████ plays no role in the fulfilment of subscriptions.  Nor does ██████ market any goods or services directly to consumers.  It is a data cooperative wherein direct-mail marketers exchange customer information for their own prospecting efforts.  Nothing else.  Hearst's only purpose for contracting with ██████ was to receive a list of new names from ██████ for its own prospecting efforts:

> Q:     Okay.  So as things exist today, Hearst is providing its
>        subscriber lists to ██████ for the purpose of obtaining new
>        prospective leads; correct?
>
> A:     Correct.

██████ Dep. at 76:20-24, Ex. 31.  *See also* PSOF ¶ 120 ("Hearst does not dispute that a purpose for which it might provide lists of select active and expired subscribers to ██████ is to receive a list of new prospects in return.").

### E.      Hearst Disclosed Plaintiff's PRI To Dunn Data

On December 3, 2008, Hearst entered into a contract with Dunn Data to provide Hearst's

subscriber records to Dunn Data on a quarterly basis.  PSOF ¶¶ 53-54 (undisputed); Ex. 21

(contract with Dunn Data).  Stephen Dunn ("Mr. Dunn"), the owner of Dunn Data, explained at

his deposition that the company is a "data aggregator" and a "middleman in the data industry":

> Q:      … Mr. Dunn, can you give me some background about
> Dunn Data?  What does the company do?
>
> A:      …  We were a data aggregator.  We acquired data from
> companies like Hearst and companies like Equifax, many
> other large publishing companies like, such as Time Inc.,
> Conde Nast, Meredith and so on.  And we put them
> together, matched them to government records and other
> compiled information about consumers and we put that into
> a large database.  …
>
> And then we license that or sell it directly for single use
> only to either brokers or data companies.
>
> …
>
> That's what we do.  So we're a middleman for the data
> industry for digital and off-line consumer marketing.

Deposition of Stephen Dunn ("Dunn Dep.") at 11:12-12-21, Ex. 22.

Mr. Dunn testified that during the roughly 5-year period, from 2008 through 2013, Hearst

provided Dunn Data with records disclosing the PRI of 22 million subscribers:

> Q:      … So one thing you said is that you get data from Hearst
> and other publishing companies.  Specifically to Hearst,
> how did you collect that data from Hearst?
>
> A:      They would send us a computer, a digital file.  I think it
> was about 22 million subscribers. …  Their entire
> subscription file would be shipped to us digitally with a
> limited amount of information attached to it, when the
> subscribers acquired for what magazine, basically and
> whether they were at renewal or a first time subscriber or
> had expired from subscribing.

*Id.* at 13:4-20.

17

> Q:    So, Mr. Dunn, for my client, Ms. James Edwards, did you
>        receive her name from Hearst?
>
> A:    Yes.
>
> Q:    Did you receive her address from Hearst?
>
> A:    Yes.
>
> Q:    Did you receive the magazine titles to which she subscribed
>        from Hearst?
>
> A:    Yes ….
>
> Q:    And you received that information on a quarterly basis
>        from 2008 through 2013?
>
> A:    That's in the contract.  …

*Id.* at 130:7-23.  Hearst's Rule 30(b)(6) designee admitted that Hearst disclosed Ms. Edwards

PRI to Dunn Data "up to nine times":

> Q:    How many times did Hearst disclose Ms. Josephine James
>        Edwards' PRI to Dunn?
>
> A:     …  So it was up to nine times.

Murphy Dep. at 366:19-367:18, Ex. 2.

The contract states that Dunn will incorporate these subscriber records into Dunn's

proprietary "Consumer Database Products (MarketShare and CPI)."  Ex. 21, at

DUNN/HEARST0002.  Dunn's "MarketShare" database was offered to rent to "all mailers with

the majority of the rental orders being submitted through list brokers":

> Marketshare is a Dunn DataCo database that is open to all mailers
> with the majority of the rental orders submitted through list
> brokers.  MarketShare contains over 125 million names provided
> by approximately 150 publishing, catalog and fundraising sources
> which have been enhanced with comprehensive demographic and
> lifestyle variables resulting in a net file of 65 million individuals
> available for list rental through targeted list selections and
> modeling techniques.

18

> The published base rate MarketShare is $80.00 per thousand with a reduced rate for participants and some lower negotiated rates for high volume mailers.

Ex. 21 at DUNN/HEARST0001. 

█████ *Id.* ("Client [Hearst] will receive ████████████████████████ for the proportionate allocation of usaged records in the month following receipt of payment for orders.").

The contract also authorized Dunn Data to incorporate Hearst's subscriber records into another proprietary database called "CPI – Consumer Passion Index":

> CPI is a Dunn DataCo proprietary behavioral database that has been created from multi-sourced transactional data that indicates various lifestyle and interest attributes. Data points have been categorized and indexed into lifestyle scores that have been matched to a major consumer compiled source that provides the name, address and demographic information (the actual record being provided to marketers). CPI is offered as a list rental product with a base rate of ███████████████ It is primarily marketed as a license for housefile installation with license fees based on the type of use and number of variables provided. All providers of data receive revenue allocated from the data portion of a particular list order or license arrangement.
>
> Specific data points from Client [Hearst] would be included in relevant interest scores and carried forward on CPI base records. … As a data provider, Client will receive a proportionate share of ████████████████████████████.

Ex. 21 at DUNN/HEARST0001. As with the MarketShare rentals, ████████████████████ ██████████████████████. *Id.* ("Client [Hearst] will receive a proportionate share of ████████████████████████████ ████████████████████████.

Hearst's 50% share of the MarketShare and CPI list rentals amounted to $156,000:

> Q:  Do you know how much you [Dunn Data] paid Hearst over the years?

A:     Yes.

Q:     How much?

A:     $156,000 total from '08 through 2013.

Dunn Dep. at 17:16-21, Ex. 22.

Dunn Data plays no role in the fulfilment of subscriptions.  Nor does Dunn Data market

any goods or services directly to consumers.  It buys and sells data.  Nothing else.  Hearst's only

purpose for contracting with Dunn Data was to sell subscriber data for money:

Q:     So, Mr. Dunn, was the purpose of this contract for Hearst to
       receive incremental revenue?

A:     Well, as I already said, yes, that's the only possible reason
       they would do it.

Q:     And Hearst did, in fact, receive increased revenue, correct?

A:     Correct.

Q:     So Mr. Dunn, is it fair to say that Hearst sold you their
       consumer data?

A:     They rented it to me.  …

*Id.* at 37:9-22.  *See also* PSOF ¶ 71 ("Hearst does not dispute that during the period 2008-2013 it

periodically received some payments from Dunn Data pursuant to the contract ….").

**F.     Hearst Disclosed Plaintiff's PRI To** ████████

On November 16, 2009, Hearst entered into a contract with ████████████████ to

provide Hearst's Company Data on a monthly basis.  PSOF ¶¶ 35, 37 (undisputed), Ex. 16

(contract with ████████  The contract defined "Company Data" as the "names and addresses of

Hearst active subscribers, expires, and new moves."  Ex. 16 (contract with ██████ at

H000014911 & H000014915.  "Company Data" also included the magazine titles associated

with each customer's subscription records.  *See* Murphy Dep. at 291:20-23, Ex. 2 ("Q:  So the

answer to my question is [Company Data] does contain title, right?  A:  It contains title, right.  It contains title, yes."); Ex. 15 (████ Tab at Row 33 "MAG_CD").

The ████ contract states that Hearst's subscriber records are to "be included, used, and marketed as a component of ████ Databases."  Ex. 16, at H000014911.  To achieve that purpose, "Hearst grants to ████ a nonexclusive, nontransferable, world-wide license to use and to market the Company Data." *Id.* ████ was permitted to use the subscriber records "for analysis and services provided to its customers." *Id.* "████ may distribute the Company Data through any type of media." *Id.* "Further, ████ may use brokers, resellers or other distribution channels in the sale and delivery of its products and services that contain the Company Data." *Id.*

Pursuant to the ████ contract, on the first Monday of each month, from July 2011 through March 2015, Hearst transmitted Plaintiff's PRI to ████ Hearst's Rule 30(b)(6) witness admitted this at his deposition:

> Q:  So from at least as early as July 2011 through March 2015
> Ms. James Edwards' Personal Reading Information was
> transmitted to ████ on the first Monday of each month?
>
> A:  She was eligible to be sent on the first Monday of each
> month.

Murphy Dep. at 304:22-305:5.

████ President and Chief Executive Officer, ████, stated in a sworn declaration that "████ received the name Josephine James, as well as her address and status as an expired subscriber to *Good Housekeeping*, *Oprah*, *Redbook* and *Woman's Day* in communications uploaded by Acxiom on December 1, 2014; January 5, 2015; February 2, 2015; and March 4, 2015."  Declaration of ████ Decl.") ¶ 5, Ex. 18. ████ also produced, in response to Plaintiff's subpoena, a copy of a spreadsheet "created by ████ from

the raw data provided by Acxiom … concerning Josephine James." *Id.* ¶ 7.  An excerpt of that

record, Exhibit 19, is reproduced here:



CONFIDENTIAL

The ████ record includes Plaintiff's name and address, as well as fields indicating that she

was a "buyer" of magazine subscriptions to *Good Housekeeping*, *Oprah*, *Redbook*, and *Woman's*

*Day*:



| MULTI-BUYER-FLA | MAG-CD | MAG DECODE |
| --- | --- | --- |
| Y | GHK | Good Housekeeping |
| Y | OPR | Oprah |
| Y | RBK | Redbook |
| Y | WDY | Women's Day |

Hearst's Rule 30(b)(6) designee admitted that Hearst disclosed Ms. Edwards' PRI to

22

> Q: Does this document [Ex. 19] confirm for you that Ms.
> James Edwards' data was transmitted to ██████ in
> November of 2014, December, 2014 --?
>
> A: So for these particular four transmissions, yes. It shows
> that Ms. Edwards' names – were transmitted to ██████

Murphy Dep. at 308:5-12, Ex. 2.

> Q: Did Hearst sell subscribers' PRI to ██████ pursuant to this
> agreement?
>
> A: Hearst disclosed the PRI of Ms. Edwards during the
> relevant period.
>
> Q: To ██████
>
> A: To ██████

*Id.* at 283:20-284:5.

Pursuant to the original ██████ contract, "[a]s consideration for the records delivered to

██████ under th[e] Agreement, ██████ … pa[id] Hearst an annual license fee of ██████

██████ payable in quarterly installments of ██████

██████ PSOF ¶ 38 (undisputed). Pursuant to a November 16, 2011 amendment to

the ██████ contract, ██████ "pa[id] Hearst an annual license fee of ██████

██████ payable in quarterly installments of ██████

██████ PSOF ¶ 44 (undisputed). Hearst's Rule 30(b)(6) designee admitted that

██████ paid Hearst for Hearst's customer data pursuant to the contracts:

> Q: Hearst was paid money for the disclosure of those data,
> right?
>
> A: Yes, it was.

Murphy Dep. at 284:20-22, Ex. 2.

████ plays no role in the fulfilment of subscriptions.  Nor does ████ market any goods or services directly to consumers.  It buys and sells data.  Nothing else.  Hearst's only purpose for contracting with ████ was to sell subscriber data for money:

> Q:     ████ doesn't sell anything but data.  Is that right?
>
> A:     My understanding is they sell lists of data.

*Id.* at 286:21-287:2.

### G.   Hearst Publicly Disclosed Plaintiff's PRI Through Hearst's Website, buysub.com

Through at least April 26, 2017, Hearst also published Plaintiff's PRI through its website, buysub.com, where anyone with access to the internet could enter Plaintiff's name and address to obtain her PRI relating to her Hearst subscriptions.  *See* Fraietta Decl. Exs. A-B.  For example, a screenshot from buysub.com shows that Plaintiff subscribed to *Good Housekeeping* and that her "Last Payment Date" for this subscription was "Dec. 1, 2008":



Fraietta Decl. Ex. A.  Hearst published this information on a portion of the website that is not password-protected or secured by any means whatsoever.  *Id.* ¶ 7.  It was entirely open and available to the public.  *Id.*  Anyone with access to the Internet could enter the Plaintiff's name and address into this website to obtain the titles of any Hearst publications Plaintiff had purchased, the status of her subscriptions, the "Payment Status" of her account, and the date of her last payment.  *Id.*

    **H.**       **Overview of Hearst's Disclosures of Plaintiff's PRI**

This table illustrates graphically the many ways that Hearst disclosed Plaintiff's PRI in violation of the VRPA:



**J.      Hearst Did Not Provide The Statutory Notice Or Any Ability To Opt-Out Of These Disclosures**

Section 445.1713(d) of the VRPA authorizes disclosure of customers' PRI "for the exclusive purpose of marketing good and services directly to the consumer" only if the customer has been provided with "written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information."  But Hearst never provided such notice.

An issue of *Good Housekeeping* magazine published during the timeframe that Plaintiff was a subscriber included fine print on page 212, under the heading "Subscription Service," stating:

> From time to time, we make our subscriber list available to companies who sell goods and services by mail that we believe would interest our readers.  If you would rather not receive such mailings please send your current mailing label or an exact copy to
>
> Mail Preference Service
> P.O. Box 7024
> Red Oak, IA 51591

Ex. 43 (March 2010 *Good Housekeeping*, page 212).  *See also* PSOF ¶¶ 204-205.

This statement does not comply with any of the requirements for the statutory notice referenced in section 445.1713(d) of the VRPA.  None of the six entities to whom Hearst disclosed Plaintiff's PRI "sell[s] goods and services by mail."  The only thing they buy and sell is data.  And they do not sell anything "directly to the consumer."  M.C.L. § 445.1713(d).  Remarkably, even if the subscriber wrote to Hearst to try to opt out, Hearst disclosed their PRI anyway.  As Hearst's Rule 30(b)(6) witness carefully explained at his deposition, "It doesn't say 'we will not disclose.'":

> Q:      My question was even if the customer does everything it says in that notice to try to prevent their PRI from being

disclosed, Hearst still discloses it to ████████ Isn't that
right?

A:     You are paraphrasing the notice.  The notice is basically
       saying we will release the names for the purpose of
       mailing.  It doesn't say "we will not disclose."  It says, "we
       will prevent the mailing of mailings by third parties."

Murphy Dep. at 354:19-355:15, Ex. 2.

No matter what the subscriber did in response to this notice, Hearst still disclosed their

PRI to Acxiom, Experian, ██████ Dunn Data and ████████

Q:     So there is nothing they can do to prevent the disclosure to
       ██████ isn't that true?

A:     It depends on the time period.

Q:     In 2011?

A:     In 2011, no, there was not that option.

Id. at 359:5-20.

Q:     There is nothing a customer can do to prevent Hearst from
       disclosing their PRI to ██████ isn't that true?

A:     If they were eligible for the criteria stated in the ██████
       extract there is nothing they could have done to prevent us
       sending that.

Id. at 361:5-19.

Q:     [I]s there any way that anyone can prevent Hearst from
       transmitting the data to Acxiom?

A:     …  [N]o, they cannot stop the transmission.

Id. at 363:9-364:7.

Q:     So – and that transmission [to Dunn Data] was going to
       happen no matter what she [Plaintiff] did in response to this
       notice in Good Housekeeping Magazine, isn't that right?

A:     If she was eligible for the criteria there was nothing that she
       could have done to stop that transmission.

28

*Id.* at 370:11-21.

> Q:  [Disclosure to Experian] was going to happen every year
>      no matter what she did, right?
>
> A:  If – if she was eligible or deemed eligible, she would have
>      – there is nothing she could have done … .

*Id.* at 371:14-23.

## III.  THE SUMMARY JUDGMENT STANDARD

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine dispute as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing

law ....  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  *See id.*  The Court "is not to

resolve disputed issues of fact but to assess whether there are any factual issues to be tried."

*Wilson v. Nw. Mut. Ins. Co.,* 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving

party's burden to establish the absence of any genuine issue of material fact.  *Zalaski v. City of*

*Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party submits evidence that is "merely colorable," summary judgment

may be granted.  *Anderson*, 477 U.S. at 249-50.  The non-moving party "must do more than

simply show that there is some metaphysical doubt as to the material facts, and may not rely on

conclusory allegations or unsubstantiated speculation."  *Brown v. Eli Lilly & Co.,* 654 F.3d 347,

358 (2d Cir. 2011) (citations and internal quotation marks omitted).  The mere existence of a

scintilla of evidence in support of the non-moving party's position is likewise insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for it. *Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *Nagle v. Marron,* 663 F.3d 100, 105 (2d Cir. 2011). If there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir. 2004).

On a motion for <u>partial</u> summary judgment, such as this one, the court may "enter an order stating any material fact that is not genuinely in dispute and treating that fact as established in the case. *Sicom S.P.A. v. TRS Inc.*, 168 F.Supp.3d 698, 705 (S.D.N.Y. Mar. 10, 2016), *citing* Fed. R. Civ. P. 56(g). "Partial summary judgment thus functions as "a pretrial adjudication that certain issues shall be deemed established for the trial of the case," which "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *Sicom S.P.A.*, 168 F.Supp.3d at 705 (quoting Fed. R. Civ. P. 56, advisory committee's note to 1946 amendment).

## IV. THERE IS NO GENUINE DISPUTE WITH RESPECT TO ANY FACT MATERIAL TO ESTABLISHING THE FOUR ELEMENTS OF A VIOLATION OF THE VRPA

To establish her claim under the VRPA, Plaintiff must prove **four elements**:

> (1)   The defendant was an employee or an agent of a person [or was himself or herself] engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings;

(2)     The plaintiff purchased, leased, rented, or borrowed a book, sound or video recording, or other written materials from the defendant;

(3)     The defendant disclosed to another person, other than the plaintiff, a record or information concerning the plaintiff's purchase, lease, rental, or borrowing of any of the listed materials; and

(4)     The disclosed record or information indicated the plaintiff's identity.

Michigan Non-Standard Jury Instr. Civil § 32:10 (2015); *see also* M.C.L. § 445.1712.

Plaintiffs' proof of each of these four elements is uncontroverted.

## A.     Hearst Is Engaged In The Business Of Selling Magazines At Retail

The first of the four elements Plaintiff must prove is that the defendant was "engaged in the business of selling at retail … written materials."  Michigan Non-Standard Jury Instr. Civil § 32:10 (2015); *see also* M.C.L. § 445.1712.  Hearst admits that it is engaged in the business of selling magazine subscriptions at retail.  PSOF ¶ 2.  Hearst admits that it sells magazine subscriptions directly to its subscribers, and sold magazine subscriptions directly to the Plaintiff. *Id.*

## B.     Plaintiff Subscribed To Hearst Magazines At Retail

The second of the four elements Plaintiff must prove is that "[t]he plaintiff purchased, leased, rented, or borrowed a book, sound or video recording, or other written materials from the defendant."  Michigan Non-Standard Jury Instr. Civil § 32:10 (2015).  Hearst admits that "some of Plaintiff's subscription orders were placed directly with Hearst."  *Id.*  Specifically, Hearst admits that Plaintiff subscribed to *Good Housekeeping*, *Oprah*, and *Redbook* magazines "directly with Hearst" at least 10 times.  *Id.* ¶¶ 169, 171, 173, 176, 178, 182, 183, 187, 191, 192 (all undisputed).

Hearst's subscription records confirm that Plaintiff subscribed directly with Hearst, at retail, for 19 of her 23 subscriptions to Hearst magazines, and Hearst's Rule 30(b)(6) designee confirmed this at his deposition. *See* Murphy Dep. at 217:17-24, Ex. 2 ("Q: And for 19 of the 23 you know that there was no third party, right? A: I know there was no third party through which the subscription came."); *See* Ex. 3 (H000014949 at cells AC212, AE212, AN212). *See also* PSOF ¶ 167 ("Hearst … does not dispute that some of [Plaintiff's] Hearst magazine subscriptions did not come to Hearst through a third party sales source ….").

### C.      Hearst Disclosed To Another Person, Other Than The Plaintiff, A Record Or Information Concerning The Plaintiff's Subscription

The third of the four elements Plaintiff must prove is that "[t]he defendant disclosed to another person, other than the plaintiff, a record or information concerning the plaintiff's purchase, lease, rental, or borrowing of any of the listed materials."  Michigan Non-Standard Jury Instr. Civil § 32:10 (2015).  Undisputed evidence confirms that Hearst disclosed to Acxiom, Experian, ██████ ██████ Dunn Data, and ██████ records or information concerning Plaintiff's purchases of magazine subscriptions, and that Hearst publicly disclosed such information through its website, buysub.com. *See* Parts II.A-J.

**Hearst's disclosure of Plaintiff's PRI to Acxiom is undisputed**.  Hearst contracted to disclose Plaintiff's PRI to Acxiom. *See* Exhibits 9 & 10; PSOF ¶¶ 9-14, 18.  Hearst's response to PSOF ¶ 13, which states that "Acxiom received source feed from multiple Hearst operational systems" that included Plaintiff's name, address and subscription information, is "undisputed." Acxiom produced records showing Plaintiff's PRI that included individual contact information (i.e., name, address, email), and subscription information, Exhibit 11, and Acxiom's Rule 30(b)(6) designee confirmed at his deposition that Hearst had transmitted Plaintiff's PRI to Acxiom.  Vanthornout Dep. at 173:5-10, Ex. 5.  Hearst's April 3, 2017 summary judgment brief

also admits, at pages 15-16, that Hearst transmitted "subscriber data" to Acxiom, which in turn transmitted "subscriber PRI" to others "at Hearst's direction." *See also* Part II.A, above.

**Hearst's disclosure of Plaintiff's PRI to Experian is undisputed**. Hearst's Rule 30(b)(6) designee admitted at his deposition that Hearst transmitted Plaintiff's PRI to Experian four times for the purpose of overlaying her record with demographic data provided by Experian. Murphy Dep. at 245:11-25, 260:21-25, Ex. 2. The Rule 30(b)(6) designee of Acxiom, which transmitted Plaintiff's PRI to Experian on Hearst's instruction, also confirmed that Plaintiff's PRI was disclosed to Experian. Vanthornout Dep. at 66:9-18. And those disclosures are confirmed by the fact that Hearst's records for the Plaintiff include demographic data provided by Experian. *See* PSOF ¶ 95 ("Hearst does not dispute that Plaintiff's record in [its] database contains certain data acquired from Experian."). Hearst's April 3, 2017 summary judgment brief also admits, at page 16, that Hearst transmitted PRI to Experian. *See also* Part II.B, above.

**Hearst's disclosure of Plaintiff's PRI to ▮▮▮▮▮ is undisputed**. Hearst's Rule 30(b)(6) designee admitted that Hearst subscribers' PRI was transmitted by Acxiom, at Hearst's direction, to ▮▮▮▮ on a monthly basis. Murphy Dep. at 348:11-21, Ex. 2. The transmission of Plaintiff's PRI to ▮▮▮▮ was confirmed when, in response to Plaintiff's subpoena, ▮▮▮▮ produced a database record that included Plaintiff's PRI, identifying Plaintiff as a subscriber to *Good Housekeeping* magazine. *See* Ex. 27. Hearst's April 3, 2017 summary judgment brief also admits, at pages 16-17, that Hearst transmitted PRI to ▮▮▮▮ *See also* Part II.C, above.

**Hearst's disclosure of Plaintiff's PRI to ▮▮▮▮ is undisputed**. Hearst admits that it contracted with ▮▮▮▮ to "contribute its [Hearst's] subscriber file and related transaction data" to the ▮▮▮▮▮ Cooperative Database. *See* PSOF ¶ 122 (undisputed). In response to Plaintiff's subpoena, ▮▮▮▮ produced a database record that identified Plaintiff as a subscriber

to *Woman's Day* magazine, a Hearst publication.  Ex. 33.  Those data could have come only

from Hearst.  Furthermore, ███████ Rule 30(b)(6) designee testified that ██████ in fact

received Plaintiff's PRI from Hearst.  █████ Dep. at 122:22-123:14, Ex. 31.  So Hearst

contracted to disclose Plaintiff's PRI to █████ █████ in fact was in possession of Plaintiff's

PRI, and █████ designee testified that █████ received it from Hearst.  *See also* Part II.D,

above.

     **Hearst's disclosure of Plaintiff's PRI to Dunn Data is undisputed.**  Hearst contracted

to disclose Plaintiff's PRI to Dunn Data.  *See* Ex. 21.  Hearst's response to PSOF ¶ 76 states that

"Hearst does not dispute that Plaintiff's status as an expired subscriber to *Good Housekeeping*

was eligible to be included in scheduled transmissions to Dunn Data."  Hearst's Rule 30(b)(6)

designee admitted that Hearst disclosed Plaintiff's PRI to Dunn Data "up to nine times."

Murphy Dep. at 366:19-367:18, Ex. 2.  Dunn Data's Rule 30(b)(6) designee testified that Dunn

Data in fact received Plaintiff's PRI from Hearst.  Dunn Dep. at 130:7-23, Ex. 22.  Hearst's April

3, 2017 summary judgment brief also admits, at pages 16-18, that Hearst transmitted subscribers'

PRI to Dunn Data.  *See also* Part II.E, above.

     **Hearst's disclosure of Plaintiff's PRI to ██████ is undisputed.**  Hearst contracted to

disclose Plaintiff's PRI to █████ on a monthly basis.  *See* Ex. 16; PSOF ¶¶ 35, 37

(undisputed).  Hearst's Rule 30(b)(6) designee testified that Hearst transmitted Plaintiff's PRI to

█████ "on the first Monday of each month."  Murphy Dep. at 304:22-305:5, Ex. 2.  ███████

President and CEO confirmed in a sworn declaration that █████ in fact received Plaintiff's PRI

from Acxiom (who had sent it on Hearst's behalf).  █████ Decl. ¶ 5, Ex. 18.  The transmission of

Plaintiff's PRI to █████ was further confirmed when, in response to Plaintiff's subpoena,

█████ produced a copy of the raw data it received from Acxiom, which includes Plaintiff's

PRI.  Ex. 19.  Hearst's Rule 30(b)(6) designee also admitted that ▮▮▮▮ record, Ex. 19,

contained Plaintiff's PRI which was disclosed to ▮▮▮▮ by Hearst.  Murphy Dep. at 283:20-

284:5, 308:5-12, Ex. 2.  *See also* PSOF ¶ 48 (undisputed).  Hearst's April 3, 2017 summary

judgment brief also admits, at pages 16-18, that Hearst transmitted subscribers' PRI to ▮▮▮▮

*See also* Part II.F, above.

### D.    The Records Disclosed By Hearst Indicated The Plaintiff's Identity

The fourth and final element Plaintiff must prove is that "[t]he disclosed record or

information indicated the plaintiff's identity."  Michigan Non-Standard Jury Instr. Civil § 32:10

(2015).  Plaintiff's name and address were contained in all of the PRI disclosures to Acxiom,

Experian, ▮▮▮▮ ▮▮▮▮ Dunn Data, and ▮▮▮▮  *See supra* Parts II.A-G, IV.C.  This too is

undisputed.

## V.    PLAINTIFF IS ENTITLED TO STATUTORY DAMAGES

Section 445.1715 of the VRPA states a plaintiff "may recover … (a) Actual damages,

including damages for emotional distress, or $5,000.00, whichever is greater."  M.C.L.

§ 445.1715(a).  Plaintiff is therefore entitled to $5,000.

Statutory damages are especially appropriate in a case like this.  The Second Circuit

describes statutory damages as "an automatic measure of recovery to plaintiffs regardless of

injury or profits."  *Business Trend Analysts, Inc. v. The Freedonia Grp., Inc.*, 887 F.2d 399, 406

(2d Cir. 1989).  Statutory damages are designed precisely for the situations in which "proof of

damages … is difficult or impossible."  *Id.*  As Judge Oetken stated:

> The Second Circuit has explained that "statutory damages are not
> meant to be merely compensatory or restitutionary," meaning that
> … a verdict should not be reversed solely because it "bears little
> relationship" to the plaintiff's actual damages.  *Yurman Design,*
> *Inc. v. PAJ, Inc.,* 262 F.3d 101, 113 (2d Cir. 2001). … [S]tatutory
> damages are by definition a substitute for unproven and
> unprovable damages.  It therefore makes no sense to consider the

> disparity between actual harm and an award of statutory damages
> when statutory damages are designed precisely for instances where
> actual harm is difficult or impossible to calculate.

*Psihoyos v. John Wiley & Sons, Inc.*, 2012 WL 5506121, at *3 (S.D.N.Y. Nov. 7, 2012) (internal

quotations and citations omitted).

The award of statutory damages is well deserved here. The record amassed during

Phase I discovery confirms that Hearst established a sophisticated network of third-party data-

mining companies to transmit its subscribers' PRI to anyone that would pay for it. *See* graphical

table providing an overview of Hearst's disclosures of PRI, at p. 26, above. Hearst did this

through sophisticated business contracts to exploit the value of subscribers' PRI so that Hearst

could sell, rent, trade, or license it to generate revenues for Hearst. *See* Parts II.A-J, above. This

was not a mistake. Hearst did this intentionally. For the purpose of making money.

Hearst also concealed these practices from its subscribers, and made no effort to notify

them, or to seek their consent. *See supra* Part II.J. And most egregiously, even if a subscriber

wrote to Hearst asking that Hearst not disclose her PRI to third-parties, Hearst disclosed it to

anyway. *See id.* These disclosures were not necessary for Hearst to operate its publishing

business. They were not even remotely related. Indeed, Hearst stopped disclosing its Michigan

subscribers' PRI to Experian, ▬▬▬ ▬▬▬ Dunn Data, and ▬▬▬ in March 2015. *See*

PSOF ¶¶ 144-152. Yet Hearst continues to sell magazines to Michiganders every day.

This was an elaborate scheme to enrich Hearst at the expense of the privacy rights of

every single Michigan subscriber.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant her

motion for partial summary judgment on Count I, for violation of M.C.L. § 445.1712, by

deeming Hearst's liability to Plaintiff on her individual claim established, and by deeming

Plaintiff's entitlement to $5,000 statutory damages pursuant to M.C.L. §445.1715(a) to be

established.  *See* Fed. R. Civ. P. 56(g) (stating that on a motion for partial summary judgment the

court "may enter an order stating any material fact – including an item of damages or other relief

– that is not genuinely in dispute and treating the fact as established in the case").

Dated: May 1, 2017

Respectfully submitted,

By:     */s/ Scott A. Bursor*
         Scott A. Bursor

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jmarchese@bursor.com
        pfraietta@bursor.com

**CAREY RODRIGUEZ**
**MILIAN GONYA, LLP**
John C. Carey
David P. Milian*
Frank S. Hedin*
1395 Brickell Avenue, Suite 700
Miami, FL 33131
Telephone: (305) 372-7474
Facsimile: (305) 372-7475
Email: jcarey@careyrodriguez.com
       dmilian@careyrodriguez.com
       fhedin@careyrodriguez.com
*Admitted Pro Hac Vice

*Attorneys for Plaintiff*